# WYOMING *v.* OKLAHOMA

No. 112, Orig.    Argued November 4, 1991—Decided January 22, 1992

438

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 461. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 473.

*Mary B. Guthrie*, Senior Assistant Attorney General of Wyoming, argued the cause for plaintiff. With her on the briefs were *Joseph B. Meyer*, Attorney General, and *Steve*

*C. Jones* and *Vicci M. Colgan,* Senior Assistant Attorneys General.

*Neal Leader,* Assistant Attorney General of Oklahoma, argued the cause for defendant. With him on the brief were *Robert H. Henry,* Attorney General, and *Thomas L. Spencer,* Assistant Attorney General.*

JUSTICE WHITE delivered the opinion of the Court.

On April 14, 1988, Wyoming submitted a motion for leave to file a complaint under this Court's original jurisdiction provided by Art. III, § 2, of the Constitution. The complaint challenged Okla. Stat., Tit. 45, §§ 939 and 939.1 (Supp. 1988) (Act),[1] which requires Oklahoma coal-fired electric generating plants producing power for sale in Oklahoma to burn a mixture of coal containing at least 10% Oklahoma-mined coal. Wyoming sought a declaration that the Act violates the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, and an injunction

---

*Marilyn S. Kite, Lawrence J. Wolfe,* and *William E. Mooz, Jr.,* filed a brief for the Wyoming Mining Association as *amicus curiae.*

[1] Act of Mar. 26, 1986, Ch. 43, §§ 1, 2, 1986 Okla. Sess. Laws 73. In full, § 939 provides:

"Coal-fired electric generating plants—Burning Oklahoma coal

"All entities providing electric power for sale to the consumer in Oklahoma and generating said power from coal-fired plants located in Oklahoma shall burn a mixture of coal that contains a minimum of ten percent (10%) Oklahoma mined coal, as calculated on a BTU (British Thermal Unit) basis."

Section 939.1 further provides:

"Cost increases to consumers and impairment of certain contracts prohibited

"The cost to the entity shall not increase cost to the consumer or exceed the energy cost of existing long-term contracts for out-of-state coal preference including preference given Oklahoma vendors as provided in Section 85.32 of Title 74 of the Oklahoma statutes."

The referenced statute, Okla. Stat., Tit. 74, § 85.32 (1981), provides "that such preference shall not be for articles of inferior quality to those offered from outside the state, but a differential of not to exceed five percent (5%) may be allowed in the cost of Oklahoma materials, supplies and provisions of equal quality."

permanently enjoining enforcement of the Act. On June 30, 1988, we granted Wyoming leave to file its bill of complaint over Oklahoma's objections that Wyoming lacked standing to bring this action and, in any event, should not be permitted to invoke this Court's original jurisdiction. 487 U. S. 1231. Oklahoma next filed a motion to dismiss on August 29, 1988, raising these same arguments. We denied the motion to dismiss on October 31, 1988, and ordered Oklahoma to answer Wyoming's complaint within 30 days. 488 U. S. 921. We thereafter appointed the Special Master, 489 U. S. 1063 (1989), who ordered the parties to complete discovery and to file a stipulation of uncontested facts, any affidavits believed to be necessary, and a short statement of any disputed issues of material fact that may require a hearing. The parties complied, and each moved for summary judgment. Wyoming argued that the Act is a *per se* violation of the Commerce Clause. Oklahoma reasserted its arguments on standing and the appropriateness of this Court's exercise of original jurisdiction, submitting as well that the Act was constitutional.

The Report of the Special Master was received and ordered filed on October 1, 1990. 498 U. S. 803. Based on the record before him, the Special Master recommended findings of fact, to which the parties do not object, and conclusions of law generally supporting Wyoming's motion for summary judgment and rejecting Oklahoma's motion for summary judgment. More specifically, the Report recommends that we hold, first, that Wyoming has standing to sue and that this case is appropriate to our original jurisdiction; and second, that the Act discriminates against interstate commerce on its face and in practical effect, that this discrimination is not justified by any purpose advanced by Oklahoma, and that the Act therefore violates the Commerce Clause. The Report also recommends that the Court either dismiss the action as it relates to an Oklahoma-owned utility without prejudice to Wyoming to assert its claim in an appropriate forum,

or, alternatively, find the Act severable to the extent it may constitutionally be applied to that utility.

Subsequently, the parties requested the Court to enter a stipulated decree adopting the Special Master's Report and containing conclusions of law.[2]  If the decree was to rule on the constitutionality of the Act, however, we preferred to have that issue briefed and argued, and the case was set down for oral argument.  501 U. S. 1215 (1991).  We now adopt the Special Master's recommended findings of fact, and, with one exception, his recommended conclusions of law.

I

The salient facts, gathered from those recommended by the Special Master and from other materials in the record, are as follows.

Wyoming is a major coal-producing State and in 1988 shipped coal to 19 other States.[3]  While the State of Wyoming does not itself sell coal, it does impose a severance tax upon the privilege of severing or extracting coal from land within its boundaries.  Wyo. Stat. §§ 39–6–301 to 39–6–308 (1990 and Supp. 1991).  The tax is assessed against the person or company extracting the coal and is payable when the coal is extracted.  The valuation of the coal for severance tax purposes is based on its fair market value.  Wyoming has collected severance taxes on coal extracted by eight

---

[2] In the proposed decree, the parties agreed to the Special Master's findings of fact and his conclusions that the Act, as applied to the privately owned utilities, violated the Commerce Clause, but that, as applied to the Oklahoma-owned utility, the Act was constitutional.  Oklahoma agreed that application of the Act to the private utilities would be enjoined, and Wyoming agreed that the Act would not be enjoined as to the state-owned utility.

[3] In 1988, just over 163.8 million tons of Wyoming coal was mined.  Only 14.6% of Wyoming's coal production was sold in-state.  Oklahoma purchased 8% of the coal mined, making it the third largest out-of-state consumer, behind Texas at 19.7% and Kansas at 8.3%.

mining companies that sell coal to four Oklahoma electric utilities.

The 40th Oklahoma Legislature, at its session in June 1985, adopted a concurrent resolution "requesting Oklahoma utility companies using coal-fired generating plants to consider plans to blend ten percent Oklahoma coal with their present use of Wyoming coal; effecting a result of keeping a portion of ratepayer dollars in Oklahoma and promoting economic development." Okla. S. Res. 21, 40th Leg., 1985 Okla. Sess. Laws 1694 (hereinafter Res. 21). The recitals and resolutions in relevant part stated:

> "WHEREAS, the use of Oklahoma coal would save significant freight charges on out-of-state coal from the State of Wyoming; and
>
> "WHEREAS, the savings on such freight charges could offset any possible costs associated with plant adjustments; and
>
> "WHEREAS, the coal-fired electric plants being used by Oklahoma utilities are exclusively using Wyoming coal; and
>
> "WHEREAS, the Oklahoma ratepayers are paying $300 million annually for Wyoming coal; and
>
> "WHEREAS, a 1982 Ozark Council Report states that $9 million of the ratepayers dollars was paid as severance tax to the State of Wyoming . . . .
>
>      .        .        .        .        .
>
> "NOW, THEREFORE, BE IT RESOLVED . . . :
>
> "THAT Oklahoma utilities using coal-fired generating plants seriously consider using a blend of at least ten percent Oklahoma coal with Wyoming coal and continue to meet air quality standards.
>
> "THAT the result of such a blend would assure at least a portion of the ratepayer dollars remaining in Oklahoma and enhancing the economy of the State of Oklahoma."

The four Oklahoma electric utilities subject to the requirements of the Act are Oklahoma Gas and Electric Company, Public Service Company of Oklahoma, and Western Farmers Electric Cooperative, all privately owned, and the Grand River Dam Authority (GRDA), an agency of the State of Oklahoma. None of these four heeded this precatory resolution. At its second session, the 40th Legislature adopted the Act challenged in this case, thus mandating the 10% minimum purchases that the previous resolution had requested. Fifteen months after the effective date of the Act, facing substantially less than full compliance by any of the utilities,[4] the next Oklahoma Legislature adopted a concurrent resolution directing the GRDA, Oklahoma's state-owned public utility, to comply with the Act. Okla. S. Res. 82, 41st Leg., 1988 Okla. Sess. Laws 1915.[5]

Charts set out in the Special Master's Report show the percentages of each utility's purchases of Oklahoma-mined coal and Wyoming-mined coal on an annual basis from 1981

---

[4] To date, no investigations or prosecutions have taken place. However, violations of the Act can be prosecuted as a misdemeanor, and the utilities can be enjoined from further violations upon recommendation of Oklahoma's State Mining Commission. See Oklahoma's Response to Wyoming's Interrogatory No. 6.

[5] The recitals and resolutions included the following:

"WHEREAS, the passage of this law in 1986 has provided over 700 new jobs in Oklahoma's coal mining industry and related employment sectors; and

"WHEREAS, another benefit of this law is an additional $31 million of taxable income has been generated through the purchases of Oklahoma mined coal; and

.          .          .          .          .

"WHEREAS, the Grand River Dam Authority has failed to comply with said law and has refused to recognize the intent of the Oklahoma State Legislature to utilize Oklahoma mined coal.

"NOW, THEREFORE, BE IT RESOLVED . . . :

"THAT the Oklahoma State Legislature hereby directs the Grand River Dam Authority to immediately begin purchasing Oklahoma mined coal and to comply with the law as stated in [the Act]."

through the first four months of 1989. See Report of Special Master 7–8. Those charts reveal that during the years 1981 through 1984, the four Oklahoma utilities purchased virtually 100% of their coal requirements from Wyoming sources. These purchases decreased slightly, if at all, in 1985 and 1986 following the adoption of the original concurrent resolution. After January 1, 1987, the effective date of the Act, these utilities reduced their purchases of Wyoming coal in favor of coal mined in Oklahoma.

Unrebutted evidence demonstrates that, since the effective date of the Act, Wyoming has lost severance taxes in the amounts of $535,886 in 1987, $542,352 in 1988, and $87,130 in the first four months of 1989.[6] These estimates are based on an equivalence of British Thermal Unit (BTU) ratings, thus accounting for the hotter burning propensities of Oklahoma coal.[7] Other unrebutted submissions confirm that Wyoming has a significant excess mining capacity, such that

---

[6] See Affidavit of Richard J. Marble, Director, Minerals Tax Division, Wyoming Department of Revenue and Taxation 3 (Exh. B to Appendix to Motion of Wyoming for Summary Judgment). Oklahoma does not contradict these estimates. Instead, its expert, an economist familiar with energy and coal-related issues, emphasizes only that Wyoming experienced a more severe loss in severance tax revenues due to its reduction of the severance tax rate and a decline in coal market prices. Affidavit of David M. Weinstein 2–3 (Exh. G to Appendix to Motion of Oklahoma for Summary Judgment). At best, Oklahoma's counteraffidavit suggests that the estimate of lost severance tax revenues is a bit too high, pointing to the slight percentages of Oklahoma coal purchased prior to the Act as indicative that Wyoming did not provide 100% of the coal purchased. *Id.*, at 3.

[7] A coal's BTU rating reflects the heat-generating efficiency of the coal when burned. Coal extracted from Wyoming's Powder River Basin—the source of coal shipped to Oklahoma since 1980—has a lower average BTU rating than the Oklahoma coal delivered to the utilities. Accordingly it takes less Oklahoma coal by weight to generate the same amount of energy as the Wyoming coal. Because sulfur content factors into Oklahoma's later argument, we note here as well that Wyoming coal has a lower average sulfur content than Oklahoma coal, thus less sulfur escapes and pollutes the air when Wyoming coal is burned.

the loss of any market cannot be made up by sales elsewhere, where Wyoming's supply has already risen to meet demand.[8]

## II

In its motion for summary judgment before the Special Master, Oklahoma again challenged Wyoming's standing, and now excepts to the Special Master's recommendation that we reject Oklahoma's submission in this respect. Having granted Wyoming leave to file its complaint over Oklahoma's objection to standing, and having denied Oklahoma's motion to dismiss for want of standing, and the parties having submitted the case on cross-motions for summary judgment, we are not at all inclined to dismiss the action at this juncture. Although we have been reluctant to import wholesale law-of-the-case principles into original actions, *Arizona* v. *California*, 460 U. S. 605, 618–619 (1983), prior rulings in such cases "should be subject to the general principles of finality and repose, absent changed circumstances or unforeseen issues not previously litigated." *Id.*, at 619. Here, Oklahoma in no way suggests any change of circumstance, whether of fact or law. In each brief submitted on the issue, Oklahoma has recited the same facts, cited the same cases, and constructed the same arguments. Of course, we surely have the power to accede to Oklahoma's request at this late date, and if convinced, which we are not, that we were clearly wrong in accepting jurisdiction of this case, we would not hesitate to depart from our prior rulings.

---

[8] One affidavit, from a principal of a consulting firm conducting economic analysis of the coal industry, reflects that in 1987 the Wyoming Powder River Basin had an annual production capacity of 186.4 million tons, versus actual 1987 production of 127.1 million tons. Affidavit of Seth Schwartz (Appendix to Response to Motion to Dismiss A–2). Moreover, the Director of the Wyoming Department of Environmental Quality, who oversees programs for permitting coal mines, informs us that as of 1987, permitted capacity in the Powder River Basin was 318 million tons, whereas total production from all coal mines was 146.5 million tons. Affidavit of Randolph Wood (Appendix to Response to Motion to Dismiss A–5).

Article III, § 2, cl. 2, of the United States Constitution provides this Court with original jurisdiction in all cases "in which a State shall be a Party." Congress has seen fit to designate that this Court "shall have original and exclusive jurisdiction of all controversies between two or more States." 28 U. S. C. § 1251(a). "In order to constitute a proper 'controversy' under our original jurisdiction, 'it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of judicial enforcement according to the accepted principles of the common law or equity systems of jurisprudence.'" *Maryland* v. *Louisiana*, 451 U. S. 725, 735–736 (1981) (quoting *Massachusetts* v. *Missouri*, 308 U. S. 1, 15 (1939)); see also *New York* v. *Illinois*, 274 U. S. 488, 490 (1927).

We are quite sure that Wyoming's submission satisfies this test. We agree with the Master's conclusion, arrived at after consideration of all the facts submitted to him, that Wyoming clearly had standing to bring this action. The Master observed:

> "The effect of the Oklahoma statute has been to deprive Wyoming of severance tax revenues. It is undisputed that since January 1, 1987, the effective date of the Act, purchases by Oklahoma electric utilities of Wyoming-mined coal, as a percentage of their total coal purchases, have declined. . . . The decline came when, in response to the adoption of the Act, those utilities began purchasing Oklahoma-mined coal. The coal that, in the absence of the Act, would have been sold to Oklahoma utilities by a Wyoming producer would have been subject to the tax when extracted. Wyoming's loss of severance tax revenues 'fairly can be traced' to the Act. See *Maryland* v. *Louisiana*, 451 U. S. 725, 736 (1981) (quoting *Simon* v. *Eastern Kentucky Welfare Rights*

*Organization*, 426 U. S. 26, 41–42 (1976)).'' Report of Special Master 11.[9]

The Master recognized that Courts of Appeals have denied standing to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues. See, *e. g., Pennsylvania* v. *Kleppe*, 174 U. S. App. D. C. 441, 533 F. 2d 668, cert. denied, 429 U. S. 977 (1976); *State of Iowa ex rel. Miller* v. *Block*, 771 F. 2d 347 (CA8 1985), cert. denied, 478 U. S. 1012 (1986). He concluded, however, that none of these cases was analogous to this one because none of them involved a direct injury in the form of a loss of specific tax revenues—an undisputed fact here. See n. 6, *supra*. In our view, the Master's conclusion about Wyoming's standing is sound.

Oklahoma argues that Wyoming is not itself engaged in the commerce affected, is not affected as a consumer, and thus has not suffered the type of direct injury cognizable in a Commerce Clause action. The authorities relied on by Oklahoma for this argument, *Oklahoma* v. *Atchison, T. & S. F. R. Co.*, 220 U. S. 277, 287–289 (1911), and *Louisiana* v. *Texas*, 176 U. S. 1, 16–22 (1900), are not helpful, however, for they involved claims of *parens patriae* standing rather than

---

[9] We note as well that the recitals in Oklahoma's initial concurrent resolution reflect that coal-fired electric plants within Oklahoma were exclusively using Wyoming coal, with the attendant recognition that "$9 million of the ratepayers dollars was paid as severance tax to the State of Wyoming." Res. 21. The Wyoming coal that would have been sold—but no longer will be sold due to the Act—to Oklahoma utilities by a Wyoming producer is subject to the tax when extracted. Wyoming, which stands to regain these lost revenues should its suit to overturn the Act succeed, is thus "directly affected in a 'substantial and real' way so as to justify [its] exercise of this Court's original jurisdiction." *Maryland* v. *Louisiana*, 451 U. S. 725, 737 (1981); see also *Texas* v. *Florida*, 306 U. S. 398, 407–408 (1939); *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 39 (1976) (plaintiff seeking to invoke Article III judicial power must "stand to profit in some personal interest").

allegations of direct injury to the State itself. Moreover, we have rejected a similar argument in *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333 (1977). In *Hunt,* the Washington State Apple Advertising Commission brought suit to declare as violative of the Commerce Clause a North Carolina statute requiring that all apples sold or shipped into North Carolina in closed containers be identified by no grade other than the applicable federal grade or a designation that the apples were not graded. The commission was a statutory agency designed for the promotion and protection of the Washington State apple industry and composed of 13 state growers and dealers chosen from electoral districts by their fellow growers and dealers, all of whom by mandatory assessments financed the commission's operations. The North Carolina officials named in the suit vigorously contested the commission's standing, either in its own right or on behalf of the apple industry it represented, arguing that it lacked a "personal stake" in the litigation because, as a state agency, it was "not itself engaged in the production and sale of Washington apples or their shipment into North Carolina." *Id.,* at 341. After addressing the commission's analogues to associational standing, we turned to the commission's allegations of direct injury:

> "Finally, we note that the interests of the Commission itself may be adversely affected by the outcome of this litigation. The annual assessments paid to the Commission are tied to the volume of apples grown and packaged as 'Washington Apples.' In the event the North Carolina statute results in a contraction of the market for Washington apples or prevents any market expansion that might otherwise occur, it could reduce the amount of the assessments due the Commission and used to support its activities. This financial nexus between the interests of the Commission and its constituents coalesces with the other factors noted above to 'assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker* v. *Carr,* [369 U. S. 186, 204 (1962)]; see also *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 459–460 (1958)." *Id.,* at 345.

That the commission was allowed to proceed in *Hunt* necessarily supports Wyoming's standing against Oklahoma, where its severance tax revenues are directly linked to the extraction and sale of coal and have been demonstrably affected by the Act.

Over Oklahoma's objection, which is repeated here, the Special Master also concluded that this case was an appropriate one for the exercise of our original jurisdiction. We agree, and we obviously shared this thought when granting Wyoming leave to file its complaint in the first instance. We have generally observed that the Court's original jurisdiction should be exercised "sparingly," *Maryland* v. *Louisiana,* 451 U. S., at 739; *United States* v. *Nevada,* 412 U. S. 534, 538 (1973), and this Court applies discretion when accepting original cases, even as to actions between States where our jurisdiction is exclusive. As stated not long ago:

"In recent years, we have consistently interpreted 28 U. S. C. § 1251(a) as providing us with substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in this Court for particular disputes within our constitutional original jurisdiction. See *Maryland* v. *Louisiana,* 451 U. S. 725, 743 (1981); *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493, 499 (1971). We exercise that discretion with an eye to promoting the most effective functioning of this Court within the overall federal system." *Texas* v. *New Mexico,* 462 U. S. 554, 570 (1983).

Specifically, we have imposed prudential and equitable limitations upon the exercise of our original jurisdiction, and of these limitations we have said:

" 'We construe 28 U. S. C. § 1251(a)(1), as we do Art. III, § 2, cl. 2, to honor our original jurisdiction but to make it obligatory only in appropriate cases. And the question of what is appropriate concerns, of course, the seriousness and dignity of the claim; yet beyond that it necessarily involves the availability of another forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had.'" *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 93 (1972), quoted in *California* v. *Texas,* 457 U. S. 164, 168 (1982).

It is beyond peradventure that Wyoming has raised a claim of sufficient "seriousness and dignity." Oklahoma, acting in its sovereign capacity, passed the Act, which directly affects Wyoming's ability to collect severance tax revenues, an action undertaken in its sovereign capacity. As such, Wyoming's challenge under the Commerce Clause precisely "implicates serious and important concerns of federalism fully in accord with the purposes and reach of our original jurisdiction." *Maryland* v. *Louisiana,* 451 U. S., at 744. Indeed, we found it not to be a "waste" of this Court's time in *Maryland* v. *Louisiana* to consider the validity of one State's "first-use tax" which served, in effect, as a severance tax on gas extracted from areas belonging to the people at large, to the detriment of other States on to whose consumers the tax passed. *Ibid.* Wyoming's claim here is no less substantial, and touches on its direct injury rather than on any interest as *parens patriae.*

Oklahoma makes much of the fact that the mining companies affected in Wyoming could bring suit raising the Commerce Clause challenge, as private parties aggrieved by state action often do. But cf. *Hunt* v. *Washington State Apple Advertising Comm'n, supra.* For reasons unknown, however, they have chosen neither to intervene in this action nor to file their own, whether in state or

federal court.[10]   As such, no pending action exists to which we could defer adjudication on this issue.   See, *e. g.*, *Illinois* v. *City of Milwaukee, supra,* at 98, 108; *Washington* v. *General Motors Corp.,* 406 U. S. 109, 114 (1972).   Even if such action were proceeding, however, Wyoming's interests would not be directly represented.   See *Maryland* v. *Louisiana, supra,* at 743; cf. *Arizona* v. *New Mexico,* 425 U. S. 794 (1976).   Indeed, Wyoming brings suit as a sovereign seeking declaration from this Court that Oklahoma's Act is unconstitutional.   The Constitution provides us original jurisdiction, and Congress has made this provision exclusive as between these parties, two States.   It was proper to entertain this case without assurances, notably absent here, that a State's interests under the Constitution will find a forum for appropriate hearing and full relief.

Oklahoma points to the general requirement, reflected in the controlling principles explained above, that "[b]efore this court can be moved to exercise its extraordinary power under the Constitution to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and it must be established by clear and convincing evidence." *New York* v. *New Jersey,* 256 U. S. 296, 309 (1921); see also *Connecticut* v. *Massachusetts,* 282 U. S. 660, 669 (1931); *Missouri* v. *Illinois,* 200 U. S. 496, 521 (1906).   On this basis Oklahoma suggests that Wyoming's interest is *de minimis* solely for the reason that loss in severance tax revenues attributable to the Act has generally been less than 1% of total taxes collected.   See Affidavit of Richard J. Marble (Exh. B to Appendix to Motion of Wyo-

---

[10] A challenge in the Oklahoma courts brought by a group of Oklahoma consumers was dismissed for lack of standing, upon a finding that they could not suffer injury due to the Act's prohibition on cost increase to consumers.   See *Northeast Oklahoma Electric Cooperative, Inc.* v. *Grand River Dam Authority,* Case No. C–88–127 (Dist. Ct. Craig Cty., Okla., Sept. 2, 1988) (Journal Entry of Judgment attached as Appendix to Reply Brief for Oklahoma on Motion for Summary Judgment).

ming for Summary Judgment). We decline any invitation to key the exercise of this Court's original jurisdiction on the amount in controversy.[11] Oklahoma's argument is, in fact, no different than the situation we faced in *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923). When Pennsylvania challenged a West Virginia statute designed to keep natural gas within its borders, there was no question but that the issue presented rose to a level suitable to our original jurisdiction:

> "The question is an important one; for what one State may do others may, and there are ten States from which natural gas is exported for consumption in other States. Besides, what may be done with one natural product may be done with others, and there are several States in which the earth yields products of great value which are carried into other States and there used." *Id.,* at 596.

And so it is here. Wyoming coal is a natural resource of great value primarily carried into other States for use, and Wyoming derives significant revenue from this interstate movement. "[T]he practical effect of [Oklahoma's] statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of the other States and what effect would arise if not

---

[11] We would not, in any event, readily find the amount here to be *de minimis*. True, the taxes lost have amounted to less than 1% of revenues received by Wyoming, but even this fractional percentage exceeds $500,000 per year. Wyoming approaches this case viewing such a drain on its tax base year after year, and it aptly paraphrases a famous statement of Senator Everett Dirkson: "[A] half million dollars here and a half million dollars there, and pretty soon real money is involved." Reply Brief for Wyoming 5, n. 3. See Respectfully Quoted: A Dictionary of Quotations Requested from the Congressional Research Service 155 (S. Platt ed. 1989) ("A billion here, a billion there, and pretty soon you're talking about real money").

one, but many or every, State adopted similar legislation."
*Healy* v. *Beer Institute,* 491 U. S. 324, 336 (1989).

Because of the nature of Wyoming's claim, and the absence
of any other pending litigation involving the same parties or
issues, we find the present case appropriate for the exercise
of this Court's original jurisdiction. Accordingly, we accept
the recommendation of the Special Master that Wyoming
should be permitted to bring this action, and we reject Okla-
homa's exceptions to the Special Master's Report.

## III

We also agree with the Special Master's ultimate conclu-
sion that the Act is invalid under the Commerce Clause.

The Commerce Clause of the United States Constitution
provides that "[t]he Congress shall have Power . . . [t]o regu-
late Commerce . . . among the several States . . . ." Art. I,
§ 8, cl. 3. It is long established that, while a literal reading
evinces a grant of power to Congress, the Commerce Clause
also directly limits the power of the States to discriminate
against interstate commerce. See *New Energy Co. of Indi-
ana* v. *Limbach,* 486 U. S. 269, 273 (1988) (citing *Hughes* v.
*Oklahoma,* 441 U. S. 322, 326 (1979); *H. P. Hood & Sons, Inc.*
v. *Du Mond,* 336 U. S. 525, 534–535 (1949); *Welton* v. *Mis-
souri,* 91 U. S. 275 (1876)). "This 'negative' aspect of the
Commerce Clause prohibits economic protectionism—that is,
regulatory measures designed to benefit in-state economic
interests by burdening out-of-state competitors." *New En-
ergy Co., supra,* at 273–274; see also *Bacchus Imports, Ltd.*
v. *Dias,* 468 U. S. 263, 270–273 (1984); *H. P. Hood & Sons,
supra,* at 532–533. When a state statute clearly discrimi-
nates against interstate commerce, it will be struck down,
see, *e. g., New Energy Co., supra,* unless the discrimination
is demonstrably justified by a valid factor unrelated to eco-
nomic protectionism, see, *e. g., Maine* v. *Taylor,* 477 U. S. 131
(1986). Indeed, when the state statute amounts to simple
economic protectionism, a "virtually *per se* rule of invalidity"

has applied. *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978).[12]

The Special Master correctly found that the Act, on its face and in practical effect, discriminates against interstate commerce. See *Bacchus Imports, Ltd.* v. *Dias, supra,* at 270. Section 939 of the Act expressly reserves a segment of the Oklahoma coal market for Oklahoma-mined coal, to the exclusion of coal mined in other States. Such a preference for coal from domestic sources cannot be characterized as anything other than protectionist and discriminatory, for the Act purports to exclude coal mined in other States based solely on its origin. See *New Energy Co., supra,* at 274; *Philadelphia* v. *New Jersey, supra,* at 626–627. The stipulated facts confirm that from 1981 to 1986 Wyoming provided virtually 100% of the coal purchased by Oklahoma utilities. In 1987 and 1988, following the effective date of the Act, the utilities purchased Oklahoma coal in amounts ranging from 3.4% to 7.4% of their annual needs, with a necessarily corresponding reduction in purchases of Wyoming coal.

As in its jurisdictional arguments, Oklahoma attempts to discount this evidence by emphasizing that the Act sets aside only a "small portion" of the Oklahoma coal market, without placing an "overall burden" on out-of-state coal producers doing business in Oklahoma. The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce. *Bacchus Im-*

---

[12] There are circumstances in which a less strict scrutiny is appropriate under our Commerce Clause decisions. "When . . . a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573, 579 (1986); see also *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). While we have recognized that there is no "clear line" separating close cases on which scrutiny should apply, *Brown-Forman Distillers, supra,* at 579, this is not a close case.

ports, Ltd. v. Dias, supra, at 268–269; Maryland v. Louisiana, 451 U. S., at 760; Lewis v. BT Investment Managers, Inc., 447 U. S. 27, 39–42 (1980). As we have only recently reaffirmed:

> "Our cases . . . indicate that where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown. . . . Varying the strength of the bar against economic protectionism according to the size and number of in-state and out-of-state firms affected would serve no purpose except the creation of new uncertainties in an already complex field." New Energy Co., supra, at 276–277.

Because the Act discriminates both on its face and in practical effect, the burden falls on Oklahoma " 'to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake.' " Hughes v. Oklahoma, supra, at 336 (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U. S., at 353). "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." Hughes v. Oklahoma, supra, at 337. We agree with the Special Master's recommended conclusions that Oklahoma has not met its burden in this respect. In this Court, Oklahoma argues quite briefly that the Act's discrimination against out-of-state coal is justified because sustaining the Oklahoma coal-mining industry lessens the State's reliance on a single source of coal delivered over a single rail line. This justification, as the Special Master noted, is foreclosed by the Court's reasoning in Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511 (1935), and H. P. Hood & Sons, Inc. v. Du Mond, supra, cases that the State's brief ignores. We have often examined a "presumably legitimate goal," only to find that the State at-

tempted to achieve it by "the illegitimate means of isolating the State from the national economy." *Philadelphia* v. *New Jersey, supra,* at 627.

The State embellishes this argument somewhat when suggesting that, by requiring the utilities to supply 10% of their needs for fuel from Oklahoma coal, which because of its higher sulfur content cannot be the primary source of supply, the State thereby conserves Wyoming's cleaner coal for future use. We have no reason to doubt Wyoming's unrebutted factual response to this argument: Reserves of low sulfur, clean-burning, sub-bituminous coal from the Powder River Basin are estimated to be in excess of 110 billion tons, thus providing Wyoming coal for several hundred years at current rates of extraction. Reply Brief for Wyoming 9, n. 4 (citing Geological Survey of Wyoming, Guidebook of the Coal Geology of the Powder River Basin, Public Information Circular No. 14, p. 126 (1980)). In any event, this contention, which is raised for the first time in Oklahoma's brief on the merits, finds no support in the records made in this case. See *Hughes* v. *Oklahoma,* 441 U. S., at 337–338, and n. 20; cf. *Maine* v. *Taylor,* 477 U. S., at 148–149.

Oklahoma argues more seriously that the "saving clause" of the Federal Power Act, 16 U. S. C. § 824(b)(1),[13] which reserves to the States the regulation of local retail electric rates, makes permissible the Act's discriminatory impact on the movement of Wyoming coal in interstate commerce. Oklahoma argues that it "has determined that effective and helpful ways of ensuring lower local utility rates include 1) reducing over-dependence on a single source of supply, a single

---

[13] "The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." 16 U. S. C. § 824(b)(1).

fuel transporter, and 2) conserving needed low-sulfur coal for the future." Brief for Oklahoma 65. Even if the Act is accepted as part of the State's rate-regulating authority, we cannot accept the submission that it is exempt from scrutiny under the Commerce Clause. Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve such a violation of the Commerce Clause as Oklahoma here seeks to justify. *Maine* v. *Taylor, supra,* at 139; *South-Central Timber Development, Inc.* v. *Wunnicke,* 467 U. S. 82, 91 (1984). We have already examined § 824(b)(1) in *New England Power Co.* v. *New Hampshire,* 455 U. S. 331 (1982), and found nothing in the statute or legislative history "evinc[ing] a congressional intent 'to alter the limits of state power otherwise imposed by the Commerce Clause.'" *Id.,* at 341 (quoting *United States* v. *Public Utilities Comm'n of Cal.,* 345 U. S. 295, 304 (1953)). There is no hint in that opinion, as suggested by Oklahoma, that a *partial*—instead of *total*—ban would have been permissible, or that in-state purchasing quotas imposed on utilities in an effort to regulate utility rates are within the "lawful authority" of the States under § 824(b)(1). Instead, our decision turned on the recognition that "Congress did no more than leave standing whatever valid state laws then existed relating to the exportation of hydroelectric energy; by its plain terms, [§ 824(b)] simply saves from pre-emption under Part II of the Federal Power Act such state authority as was otherwise 'lawful.'" *New England Power Co., supra,* at 341. Our decisions have uniformly subjected Commerce Clause cases implicating the Federal Power Act to scrutiny on the merits. See, *e. g., New England Power Co., supra; Arkansas Electric Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n,* 461 U. S. 375, 393 (1983).

We need say no more to conclude that Oklahoma has not met its burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the discrimination against interstate commerce occurring here. In light of the

foregoing, we adopt the Special Master's conclusion that the Act manifests fatal defects under the Commerce Clause.

## IV

Finally, we address a question of severability raised in the exceptions filed by Wyoming to the Special Master's Report.

The GRDA is an agency of the State of Oklahoma, and, as such, Oklahoma acts as a market participant in directing its purchases of coal. We have recognized that the Commerce Clause does not restrict the State's action as a free market participant. *Reeves, Inc.* v. *Stake,* 447 U. S. 429, 436–437 (1980); *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 806–810 (1976). The Special Master recommends that the market-participant exception is available to Oklahoma, but only if the application of the Act to the GRDA may be considered separately, or severed, from its application to the three private utilities. As the determination of severability will in this situation be one of state law, *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612, 624 (1985), the Special Master recommends that we enter judgment with respect to the three private utilities but dismiss Wyoming's complaint as it relates to the GRDA without prejudice to the right of Wyoming to reassert the claim in an "appropriate forum." Report of Special Master 32. We sustain Wyoming's exception to these recommendations of the Special Master. This action is one between two States presented under our original jurisdiction; this Court is the appropriate forum to decide issues necessary to afford the complaining State complete relief. Cf. *Dorchy* v. *Kansas,* 264 U. S. 286, 291 (1924). We deem it proper and advisable to address the issue of severability ourselves.

In the alternative, the Special Master looked to Oklahoma law and found the Act severable as to the GRDA, a conclusion with which we disagree. It is true that Oklahoma courts have held that valid portions of a statute are severable " 'unless it is evident that the Legislature would not

have enacted the valid provisions with the invalid provisions removed, if with the invalid provisions removed the rest of the act is fully operative as a law.'" *Englebrecht* v. *Day*, 201 Okla. 585, 591, 208 P. 2d 538, 544 (1949) (quoting *Sterling Refining Co.* v. *Walker*, 165 Okla. 45, 25 P. 2d 312 (1933)). It is also true that under Oklahoma law, a severability clause in a statute creates a presumption that the legislature would have adopted the statute with the unconstitutional portions omitted. 201 Okla., at 591, 208 P. 2d, at 544; see *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 234–235 (1932) (inquiring into severability under Oklahoma law). The Act in this case contains a severability provision:

> "The provisions of this act are severable and if any part or provision shall be held void, the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this act." Act of Mar. 26, 1986, Ch. 43, § 3, 1986 Okla. Sess. Laws 74.

But there are no parts or separate provisions in the invalid § 939 of the Act. It applies to "[a]ll entities providing electric power for sale to the consumer in Oklahoma" and commands them to purchase 10% Oklahoma-mined coal. Okla. Stat., Tit. 45, § 939 (Supp. 1988). Nothing remains to be saved once that provision is stricken. Accordingly, the Act must stand or fall as a whole.

We decline Oklahoma's suggestion that the term "all entities" be read to uphold the Act only as to the GRDA, for it is clearly not this Court's province to rewrite a state statute. If "all entities" is to mean "the GRDA" or "state-owned utilities," the Oklahoma Legislature must be the one to decide. Indeed, this argument perceives the nature of the severability clause to be much different than that written by the Oklahoma Legislature. Severability clauses may easily be written to provide that if application of a statute to some classes is found unconstitutional, severance of those classes permits

application to the acceptable classes.[14]   Moreover, the statute could itself have been written to address explicitly the GRDA.[15]   The legislature here chose neither course.

The State provides no additional insight into the intent of its legislature on this question.   The Act would become a fundamentally different piece of legislation were it construed to apply only to the GRDA.   We leave to the Oklahoma Legislature to decide whether it wishes to burden this state-owned utility when private utilities will otherwise be free of the Act's restrictions.

V

We deny Oklahoma's motion for summary judgment and grant that of Wyoming.   In sum, we hold that the Act is unconstitutional under the Commerce Clause.   No portion is severable as to any entity touched by its mandate.   A judgment and decree to that effect and enjoining enforcement of the Act will be entered.   Jurisdiction over the case is retained in the event that further proceedings are required to implement the judgment.

*So ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

In the almost century and a half since we first entered the business of entertaining "negative Commerce Clause" actions, see *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Society for Relief of Distressed Pilots,* 12 How. 299 (1852), I think it safe to say that the federal courts have

---

[14] See, *e. g., INS* v. *Chadha,* 462 U. S. 919, 932 (1983), where the severability clause provided: " 'If any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the act and the application of such provision to other persons or circumstances shall not be affected thereby' " (emphasis deleted).

[15] See, *e. g.,* Mo. Ann. Stat. § 34.080 (Vernon 1969), which expressly requires all state agencies to purchase Missouri coal if it is available at a competitive price.

never been plagued by a shortage of these suits brought by private parties, and that the nontextual elements of the Commerce Clause have *not* gone unenforced for lack of willing litigants. Today, however, when the coal companies with sales allegedly affected by the Oklahoma law have, for whatever reason, chosen not to litigate, the Court sees fit, for the first time, to recognize a *State's* standing to bring a negative Commerce Clause action on the basis of its consequential loss of tax revenue. That is a major step, and I think it is wrong. Even if it were correct, however, summary judgment that Wyoming suffered consequential loss of tax revenue in the present case would be unjustified. I would deny Wyoming's motion for summary judgment and grant Oklahoma's.

## I

At the outset, let me address briefly the Court's suggestion that our previous rejections of Oklahoma's standing objections—when we granted Wyoming leave to file its complaint and when we denied Oklahoma's motion to dismiss for want of standing—somehow impede us from considering that objection today. *Ante*, at 446. To begin with, the "law-of-the-case principles" which the Court suggests should be persuasive albeit not necessarily binding in original actions, *ibid.*, have never to my knowledge been applied to jurisdictional issues raised (or reraised) before final judgment. To the contrary, it is a court's *obligation* to dismiss a case *whenever* it becomes convinced that it has no proper jurisdiction, no matter how late that wisdom may arrive. See Fed. Rule Civ. Proc. 12(h)(3) ("*Whenever* it appears . . . that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action") (emphasis added). See also *Jenkins* v. *McKeithen*, 395 U. S. 411, 421 (1969). Of course, this does not mean that a court need let itself be troubled by the same jurisdictional objection raised over and over again, when it has thoroughly considered that issue once and remains convinced that it resolved the issue correctly. But that is quite

different from "law of the case," which would give effect even to an erroneous decision, simply because it has already been made.

And in the present case, we have *not* considered the standing issue thoroughly once before. We disposed of Oklahoma's preliminary standing objections summarily, without oral argument and without opinion. I considered us to be deciding at that time, not, once and for all, that standing existed, but simply that the absence of standing was not so clear that our normal practice of permitting the suit to be filed and of referring all questions *(including the standing question)* to a special master should be short circuited. The parties apparently understood our action that way, since the standing issue was raised (without "law-of-the-case" objection from Wyoming) before the Special Master. And the Master certainly did not think that we had conclusively decided the point, since he received argument on it and discussed it as the very first of the "three legal issues that require a recommendation to the Court." Report of Special Master 10. If the *Special Master* was not precluded by our prior action, it is hard to understand why we ourselves would be.

There is no unfairness to Wyoming in this. To be sure, we might have given the standing question full-dress consideration to begin with, and, if we concluded in Oklahoma's favor, could have spared the parties lengthy proceedings before the Special Master. But the same could be said of the substantive issue whether the Act violated the Commerce Clause. Our choice not to proceed in that fashion was both in accord with ordinary practice and in my view sound. Almost all other litigants must go through at least two other courts before their case receives our attention. It has become our practice in original-jurisdiction cases to require preliminary proceedings before a special master, to evaluate the facts and sharpen the issues. Wyoming has no cause for complaint that we did that here, and we should not distort

our jurisdictional holding on the basis of some misguided feeling of estoppel.

Finally, even if the Court were correct that some "change of circumstance," *ante,* at 446, ought to be presented before the jurisdictional objection that we denied so cursorily at the preliminary stage can be reraised, such a change in fact exists. The litigation has reached a *new stage,* having proceeded from a motion for judgment on the pleadings (which we denied) to cross-motions for summary judgment (which the Special Master recommended resolving in favor of Wyoming). When a district court denies the former, it need feel no compunction of consistency to deny the latter; and the same is true for us. The standing issue is obviously subject to different evaluation, depending upon the stage the litigation has reached. A plaintiff may survive a motion to dismiss for lack of injury in fact by merely alleging that a string of occurrences commencing with the challenged act has caused him injury; at that stage we presume that "general allegations embrace those specific facts that are necessary to support the claim," *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 889 (1990). See also *Whitmore* v. *Arkansas,* 495 U. S. 149, 158–159 (1990). A plaintiff cannot, however, on the basis of the same generalizations, obtain or avoid summary judgment, where a moving party must "show that there is no genuine issue as to any material fact," Fed. Rule Civ. Proc. 56(c), and where a nonmoving party cannot rest on "mere allegations" to counter a properly supported motion, but must set forth "specific facts" through affidavits or other evidence, Fed. Rule Civ. Proc. 56(e). See *Lujan, supra,* at 884–885. See also *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 115, and n. 31 (1979). It is the adequacy of *these* presentations that Oklahoma now asks us to evaluate—and we have not evaluated them before.

## II

It is axiomatic that "a litigant first must clearly demonstrate that he has suffered an 'injury in fact'" in order to assert Article III standing to sue. *Whitmore, supra,* at 155. In assessing a claim to injury, "[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record," *Renne* v. *Geary,* 501 U. S. 312, 316 (1991) (internal quotation marks omitted). See also *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 546 (1986); it is accordingly "the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating" that he has been injured. *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 231 (1990) (internal quotation marks omitted). This burden is "substantially more difficult" to bear when the asserted injury is "highly indirect and results from the independent action of some third party not before the court"—for the simple reason that there are more variables involved. *Allen* v. *Wright,* 468 U. S. 737, 757–759 (1984). See also *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 42, 44–45 (1976); *Warth* v. *Seldin,* 422 U. S. 490, 504–505 (1975). It is incumbent upon the plaintiff to eliminate those variables through "specific, concrete facts," showing that the third party actually acted as he maintains and that the injury actually occurred. *Id.,* at 508.

As I have mentioned, the plaintiff's success in meeting this burden is to be assessed under the rules governing the stage the litigation has reached. See *Lujan, supra,* at 884–885. See also *Gladstone, supra,* at 115, and n. 31; *Simon, supra,* at 45, n. 26; *Warth, supra,* at 527, and n. 6 (Brennan, J., dissenting). Wyoming's motion for summary judgment thus cannot be granted unless Wyoming has demonstrated that "there is no genuine issue" as to its injury, Fed. Rule Civ. Proc. 56(c), see *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 157 (1970)—which means that "[i]f reasonable minds could differ as to the import of the evidence," the motion must be

denied, *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 250–251 (1986). To be entitled to prevail at this stage, therefore, Wyoming must have submitted "specific, concrete facts," *Warth, supra,* at 508, which when "viewed in the light most favorable" to Oklahoma "foreclose" all reasonable inferences that Wyoming was not injured by the Act, *Adickes, supra,* at 157. Wyoming has not in my view remotely carried that burden, and the Special Master's recommendation to grant its motion for summary judgment must be rejected.

The Special Master apparently thought Wyoming's injury unquestionable because it is undisputed that, since the Act's effective date, Oklahoma utilities have bought less Wyoming coal as a percentage of their coal purchases. Report of Special Master 11. I am willing to assume for the sake of argument that that undisputed fact compels the inference that less Wyoming coal was sold in Oklahoma as a result of the Act. To establish injury, however, Wyoming had to show not merely that the statute caused Oklahoma *sales* to be lost, but that it prevented Wyoming "*severances*" of coal from occurring. Wyoming does not tax sales of coal to Oklahoma utilities; it taxes severances. The loss of a particular Oklahoma sale would *not* hurt Wyoming's treasury at all unless (1) the coal that was the subject of that sale was not severed to be sold elsewhere, or (2) if it was severed to be sold elsewhere, that latter sale (and severance) would have occurred even if the Oklahoma sale had been made.

The Court o'erleaps this inconvenient obstacle by asserting that "a loss of specific tax revenues [is] an undisputed fact here." *Ante,* at 448. I cannot imagine where this helpful concession comes from. The Special Master listed the undisputed facts, and it is not among them. See Report of Special Master 2–10, 11.

The Court also appears to believe that the second of the above described means of connecting sales loss with tax loss is established by the fact that "Wyoming has a significant

excess mining capacity"; this fact, according to the Court, necessarily means that "the loss of any market cannot be made up by sales elsewhere." *Ante*, at 445, 446. That is not so. Excess capacity *can* mean the existence of facilities capable of producing additional quantities of goods that can be sold for a profit at current market prices—in which case the loss of one sale cannot really be "replaced" by the gain of another. But excess capacity *need not* mean that. It can also mean the existence of facilities that lie fallow because, although they can produce additional quantities of goods, they cannot do so at a cost that will yield a profit at current market prices. Innumerable capped or unexploited oil wells in this country exemplify that phenomenon. If *that* is the sort of excess capacity the Wyoming coal industry has, it nonetheless has a limited capability of sales at current market prices—in which case so long as that capability has been fully achieved no tax revenue has been lost.

The excess capacity attested to by Wyoming's experts may well have been of this latter sort, since it was said to have been created in response to 1970's "forecasts of high demand growth." Affidavit of Seth Schwartz, Appendix to Response to Motion to Dismiss A-2. Higher demand generally means higher prices, and the coal companies might well have brought new, higher cost production facilities on line (for example, deep-pit mines) that are at current prices not competitive. Even if the entire "excess capacity" is competitive, since much of it came (according to Wyoming's expert) from the opening of "new mines," *ibid.*, another possibility is that the Wyoming industry responded to less-than-anticipated demand in an efficient manner—by closing down some of the mines entirely rather than leaving them all in operation at a fraction of capacity. Under these conditions, it might well not pay a particular company to make a particular additional sale, if that additional sale would require the

reopening of an additional mine, with the incremental cost that entails.*

The speculations Wyoming invites us to engage in are certainly plausible (though one must be given pause by the fact that the Wyoming coal companies themselves—who if Wyoming is right have lost not just the *tax* on the severances but the *entire profits*—have not chosen to litigate). Were this a trial on the record I might well conclude that it is more likely than not that Wyoming was injured. But "at the summary judgment stage [our] function is not to weigh the evidence." *Anderson, supra,* at 249. It has at least not been conclusively established that Wyoming coal producers would have sold coal in addition to that diverted from the (presumably) lost Oklahoma sales. A genuine issue of material fact thus exists, and the Special Master's recommendation that we grant Wyoming's motion for summary judgment must be rejected.

## III

Even if Wyoming had fully established, in the manner Rule 56 provides, the "injury in fact" required by Article III, I would still conclude that it does not have standing to bring this suit, and would grant Oklahoma's cross-motion for summary judgment. "Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 474 (1982).

---

*Wyoming's expert, a coal market analyst from Virginia, averred by affidavit that "[i]n [his] opinion" the lost sales could not be made up. Affidavit of Seth Schwartz, Appendix to Response to Motion to Dismiss A–3. That is not enough to establish the point. Schwartz did not, as Rule 56(e) requires, set forth the "facts" upon which he based his opinion. Just as the requirements for summary judgment are not met when a court makes unsubstantiated inferences about a third party's behavior, see, *e. g., Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 884–885 (1990), they are not met when the plaintiff hires an outside expert to do the same.

One of these is the requirement that the plaintiff "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint." *Air Courier Conference of America* v. *Postal Workers*, 498 U. S. 517, 523–524 (1991) (internal quotation marks omitted). The "zone-of-interests" formulation first appeared in cases brought under § 10 of the Administrative Procedure Act, 5 U. S. C. § 702, see *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153 (1970), but we have subsequently made clear that the same test similarly governs claims under the Constitution in general, see, *e. g., Valley Forge, supra*, at 475, and under the negative Commerce Clause in particular, see *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 320–321, n. 3 (1977). Indeed, we have indicated that it is *more* strictly applied when a plaintiff is proceeding under a "constitutional . . . provision" instead of the "generous review provisions of the APA." *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 400, n. 16 (1987).

The zone-of-interests test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the [constitutional provision]." *Id.*, at 394, 399. The usual starting point for zone-of-interests analysis is the text of the provision at issue, see *Air Courier Conference*, 498 U. S., at 524–525; since, however, the negative Commerce Clause is an inference rather than a text, the starting point here must be the history and purposes of the inference, see *id.*, at 526–527.

Our negative Commerce Clause jurisprudence grew out of the notion that the Constitution implicitly established a national free market, under which, in Justice Jackson's words, "every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation [and] every consumer may

look to the free competition from every producing area of the Nation to protect him from exploitation." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 539 (1949). Virtually every one of our cases in this area thus begins its analysis with some form of the incantation that "the very purpose of the Commerce Clause was to create an area of free trade among the several States . . . [and the Clause] by its own force created an area of trade free from interference by the States." *Westinghouse Electric Corp.* v. *Tully,* 466 U. S. 388, 402–403 (1984) (internal quotation marks omitted); see also *Boston Stock Exchange, supra,* at 328; *American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266, 280 (1987). Just last Term we said that the negative Commerce Clause "confer[s] a 'right' to engage in interstate trade free from restrictive state regulation," for it "was intended to benefit those who . . . are engaged in interstate commerce." *Dennis* v. *Higgins,* 498 U. S. 439, 448, 449 (1991) (emphasis deleted).

The coal companies, of course, would pass the zone-of-interests test. So would Wyoming if it bought or sold coal, or otherwise directly participated in the coal market. It would then be "asserting [its] *right . . . to engage in interstate commerce* free of discriminat[ion]," *Boston Stock Exchange, supra,* at 320–321, n. 3 (emphasis added). But Wyoming's right to collect taxes presents an entirely different category of interest, only marginally related to the national market/free trade foundation of our jurisprudence in this area; indeed, it is in a sense positively antagonistic to that objective, since all state taxes, even perfectly constitutional ones, burden interstate commerce by reducing profit. Thus, when state taxes have been at issue in our prior negative Commerce Clause cases they have been the object of the plaintiff's challenge rather than the basis for his standing; and we have looked upon the State's interest in tax collection as a value to be *weighed against* the purposes of our Commerce Clause jurisprudence. Thus, Wyoming's interest in this case falls far shorter of meeting the zone-of-interests

test than did that of the plaintiff postal union in *Air Courier Conference, supra,* at 528: Whereas the latter's interest in securing employment for postal workers, although distinct from the statute's goal of providing postal services to the citizenry, at least coincided with that goal a good amount of the time, here the asserted interest (tax collection) and the constitutional goal invoked to vindicate it (free trade) are antithetical.

In seeming response to a zone-of-interests argument, the Court quotes, *ante,* at 449, our statement in *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 345 (1977), that "the interests of the [Washington State Apple Advertising] Commission itself may be" at issue in the litigation, because "[i]n the event the North Carolina statute results in a contraction of the market for Washington apples or prevents any market expansion that might otherwise occur, it could reduce the amount of the assessments due the Commission." The Court fails to note that this statement was *preceded* by the square holding that the State Apple Advertising Commission had standing to sue *as an association* on behalf of its members, the apple growers and dealers (who were in the same position as the coal companies here):

> "If the Commission were a voluntary membership organization—a typical trade association—its standing to bring this action as a representative of its constituents would be clear . . . .
>
> . . . . .
>
> "The only question presented, therefore, is whether, on this record, the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from asserting the claims of the Washington apple growers and dealers who form its constituency. We think not." *Id.,* at 342–344.

Only after finding associational standing did we speculate, in the passage the Court quotes, that the commission itself

"may be" adversely affected because its revenue collections "could [be] reduce[d]." *Id.*, at 345. I hardly think that musings of this sort are grounds for disregarding the obvious application of the zone-of-interests test to the present case— particularly as the Court in *Hunt* did not purport to be applying that test. The dicta in *Hunt,* moreover, were applying a since-repudiated understanding of the purpose of the standing requirement. Compare the last sentence of the passage quoted by the Court (taking the purpose to be "to 'assure that concrete adverseness which sharpens the presentation of issues . . . ,'" *ibid.,* quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962)), with *Allen,* 468 U. S., at 750–752 (asserting that standing performs a separation-of-powers function, restricting the courts to their traditional role).

Of course, if the state interest in collecting severance taxes does fall within the zone of interests of the Commerce Clause, so must every other state taxing interest. The zone-of-interest test, as opposed to the injury-in-fact requirement, turns on the type of interest asserted and not on its speculativeness or its degree of attenuation from its alleged source. The injury-in-fact requirement, of course, will still remain—but if and when *de facto* causality can be established, every diminution of state revenue attributable to the allegedly unconstitutional commercial regulation of a sister State will now be the basis for a lawsuit. Suits based on loss of sales tax revenue ought to become a regular phenomenon, since it is no more difficult to show that an automatic sales tax was lost on a particular sale than it is to show that the severance tax was lost here. Further expansions of standing (or irrational distinctions) lurk just around the corner: If a State has a litigable interest in the taxes that would have been paid upon an unconstitutionally obstructed sale, there is no reasonable basis for saying that a company salesman does not have a litigable interest in the commissions that would have been paid, or a union in the wages that would have been earned.

In abandoning the zone-of-interests test, the Court abandons our chosen means of giving expression, in the field of constitutional litigation, to the principle that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated General Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 536 (1983). The "zone-of-interests" test performs the same role as many other judge-made rules circumscribing the availability of damages in tort and contract litigation—doctrines such as foreseeability and proximate cause, see, *e. g., Palsgraf* v. *Long Island R. Co.,* 248 N. Y. 339, 162 N. E. 99 (1928); directness of injury, see, *e. g., Associated General Contractors, supra,* at 540–541; the limitation on suits by third-party beneficiaries of contracts, see, *e. g.,* Restatement (Second) of Contracts § 302(1) (1981); and the contemporaneous ownership rule governing shareholders' derivative actions, see, *e. g.,* Fed. Rule Civ. Proc. 23.1. When courts abolish such limitations and require, as our opinion does today, nothing more than a showing of *de facto* causality, exposure to liability becomes immeasurable and the scope of litigation endless. If today's decision is adhered to, we can expect a sharp increase in state against state Commerce Clause suits; and if its rejection of the zone-of-interests test is applied logically, we can expect a sharp increase in all constitutional litigation.

\* \* \*

Of the three points I have discussed in the three portions of this opinion, I must believe that the first is the crucial one: the Court's reluctance, in an original action, to reconsider our initial denial of a motion to dismiss for lack of standing. I shall consider that to be an essential part of the holding of the case. I respectfully dissent.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Even if I believed that Wyoming had standing to challenge the Oklahoma statute (which, for the reasons given by JUS-

TICE SCALIA, I do not), I would decline to exercise the Court's original jurisdiction here.

The Constitution provides that "[i]n all Cases . . . in which a State shall be a Party, the supreme Court shall have original Jurisdiction." U. S. Const., Art. III, § 2, cl. 2. Congress, in turn, has provided that "[t]he Supreme Court shall have original and exclusive jurisdiction of all controversies between two or more States." 28 U. S. C. § 1251(a). Given these provisions, one might expect—assuming the existence of a "case" or "controversy"—that we would be required to exercise our original jurisdiction here, for a court having jurisdiction generally must exercise it. "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821) (Marshall, C. J.). As the Court observes, however, *ante*, at 450–451, we have exercised discretion in declining to hear cases that fall within the literal terms of our original jurisdiction. See, *e. g.*, *United States* v. *Nevada*, 412 U. S. 534, 538 (1973) *(per curiam)* (controversy between the United States and individual States); *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 497–499 (1971) (action by a State against the citizens of other States). We exercise this discretion even with respect to controversies between two or more States, which fall within our original *and exclusive* jurisdiction.* See, *e. g.*, *Texas* v. *New Mexico*,

---

*JUSTICE STEVENS has stated that the Court's explanations for declining to exercise its *nonexclusive* original jurisdiction are "inapplicable" where, as here, its original jurisdiction is *exclusive* under 28 U. S. C. § 1251(a). *California* v. *West Virginia*, 454 U. S. 1027, 1027–1028 (1981) (opinion dissenting from denial of motion to file bill of complaint). Similarly, commentators have suggested that the Court's statement that " 'the congressional grant of exclusive jurisdiction under § 1251(a) . . . requir[es] resort to our obligatory jurisdiction only in appropriate cases' " is "an oxymoron." P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 344 (3d ed. 1988) (quoting *Maryland* v. *Louisiana*, 451 U. S. 725, 739 (1981) (internal quotation marks omitted)). See also Shapiro, Jurisdiction and Discretion, 60

462 U. S. 554, 570 (1983); *California* v. *Texas,* 457 U. S. 164, 168 (1982) *(per curiam); Maryland* v. *Louisiana,* 451 U. S. 725, 739 (1981); *Arizona* v. *New Mexico,* 425 U. S. 794, 796–798 (1976) *(per curiam).* I believe that the Court's decision to accept jurisdiction over this case is a misguided exercise of that discretion.

"It has long been this Court's philosophy that 'our original jurisdiction should be invoked sparingly.'" *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 93 (1972) (quoting *Utah* v. *United States,* 394 U. S. 89, 95 (1969)). The sound reasons for this approach have been set forth on many occasions, see, *e. g., Ohio* v. *Wyandotte Chemicals Corp., supra,* at 498; *Maryland* v. *Louisiana, supra,* at 761–763 (REHNQUIST, J., dissenting), and I need not repeat them here. As Chief Justice Fuller aptly observed almost a century ago, our original jurisdiction "is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute." *Louisiana* v. *Texas,* 176 U. S. 1, 15 (1900). In determining which cases merit the exercise of original jurisdiction, the Court typically has focused on two considerations: the nature of the claims involved and the availability of alternative forums where they can be addressed. See, *e. g., Illinois* v. *City of Milwaukee, supra,* at 93; *Massachusetts* v. *Missouri,* 308 U. S. 1, 18–19 (1939).

In my view, both factors cut strongly against exercising original jurisdiction here. Wyoming claims to be injured as follows: The Oklahoma statute decreases coal sales by Wyoming mining companies to Oklahoma buyers, which supposedly decreases the amount of coal those companies extract in

---

N. Y. U. L. Rev. 543, 561 (1985) (calling "unanswerable" criticism of the Court's discretionary approach to cases within its exclusive original jurisdiction).

As noted in text, the Court has held otherwise and those precedents have not been challenged here. The exercise of discretion is probably inevitable as long as the Court's approach to standing is as relaxed as it is today.

Wyoming, which in turn supposedly decreases the tax revenues Wyoming collects from the companies when they extract the coal. Plainly, the primary dispute here is *not* between the States of Wyoming and Oklahoma, but between the private Wyoming mining companies and the State of Oklahoma, whose statute reduced the companies' sales to Oklahoma utilities. It is true, as the Court notes, *ante*, at 451, that Oklahoma passed the statute in its sovereign capacity and that Wyoming collects taxes in its sovereign capacity. That States act *qua* States is certainly very relevant in assessing the "seriousness and dignity" of a claim. See *Maryland* v. *Louisiana, supra*, at 764–766 (REHNQUIST, J., dissenting). But it is also critical to examine the extent to which the sovereigns actually have clashed. Cf. *Arizona* v. *New Mexico, supra*, at 797–798 ("In denying the State of Arizona leave to file, we are not unmindful that the legal incidence of [the challenged action by New Mexico] is upon the utilities"). In my view, an entirely derivative injury of the type alleged by Wyoming here—even if it met minimal standing requirements—would not justify the exercise of discretionary original jurisdiction. Additionally, of course, Wyoming has advanced no reason why the affected mining companies (hardly bashful litigants) did not or could not themselves challenge the Oklahoma statute in another, more convenient, forum. The lower federal courts and the state courts are readily available as appropriate forums "in which the *issues* tendered here may be litigated." *Id.*, at 797 (emphasis in original).

The implications of the Court's novel theory that tax-collection injury alone justifies exercise of original jurisdiction are, in my view, both sweeping and troubling. An economic burden imposed by one State on another State's taxpayers will frequently affect the other State's fisc. (That will virtually always be the case, for example, with respect to income taxes; if State A takes actions that reduce the income of the taxpayers of State B, State B will collect less

income-tax revenue.) Under today's opinion, a State that can show *any* loss in tax revenue—even a *de minimis* loss, see *ante*, at 452–453, and n. 11—that can be traced (albeit loosely) to the action of another State can apparently proceed directly to this Court to challenge that action. Perhaps the Court is not concerned about that possibility because of its "discretion" in managing its original docket. But, having extended the original jurisdiction to one State's claim based on its tax-collector status, the Court cannot, in the exercise of discretion, refuse to entertain future disputes based on the same theory. That would be the exercise not of discretion, but of caprice.

I respectfully dissent.