KEETON, District Judge
(concurring).
I. Introduction
I concur in the judgment reversing the decision of the district court and vacating the preliminary injunction. Because the appropriate grounds of the decision involve issues that are fundamental to harmonizing interests in liberty and order under the Constitution of the United States, I conclude that it is appropriate, if not obligatory, that I state in a concurring opinion the grounds as I see them for reaching this judgment.
For reasons associated with undisputed facts about Pharmaceutical Benefit Managers (PBMs) and relationships between interests they represent and interests of citizens of Maine represented by the Commissioner, Maine Department of Human Services, Maine’s Legislature, and Maine’s Attorney General, I turn first to a more extended recitation of background facts regarding standing and jurisdiction than appears in the opinion of the Court of Appeals, delivered by Judge Bownes.
II. Background Facts on Standing and Jurisdiction to Consider Group or Association Contentions
Did the district court have authority, and does the Court of Appeals have authority, to consider positions stated in briefs on behalf of groups or associations seeking to represent the interests of their members that they claim are materially affected by orders made, or that might be made, in the district court and on appeal?
The case before us is styled Pharmaceutical Research and Manufacturers of America, Plaintiff, Appellee, v. Kevin Con- *87 cannon, Commissioner, Maine Department of Human Services, and Maine Attorney General, Defendants, Appellants.
Plaintiff/Appellee’s CORPORATE DISCLOSURE STATEMENT says that “plaintiffiappellee, Pharmaceutical Research and Manufacturers of America, by and through its undersigned counsel, and, pursuant to Fed.R.Civ.P. 26.1, states that it has no parent company and that no publicly held company owns any of its stock.”
In its brief, which uses the short title PhRMA to designate itself, Plaintiff/Appel-lee refers to additional characteristics and rights of PhRMA.
4- It has the ability to challenge adverse treatment under the Maine Act, including a challenge on preemption grounds. Plaintiff/Appellee’s Brief at 34.
+ It has members who are “regulated by and make payments consistent with the provisions of the Medicaid prescription drug program.” Id. at 36 n. 21.
Also, on the basis of the limited information available in the record, I infer that some of PhRMA’s members are Pharmacy Benefit Managers (PBMs). No party or amicus, or attorney for a party or amicus, has called attention to any ease explicitly declaring that PBMs have standing and a United States district court has jurisdiction to consider either a facial challenge or an as-applied challenge by a PBM to a state statute like Maine’s Act to Establish Fairer Pricing for Prescription Drugs, and I am aware of none. Treating the issue as one of first impression, I would recognize both standing and jurisdiction, in the United States District Court for the District of Maine, and on appeal. In the world outside the court system, as a pragmatic matter no other person or entity is as active and effective in protecting benefits and beneficiaries of availability of pharmacy products at reasonable cost as PBMs. It is entirely appropriate in these circumstances that the standing of PBMs be recognized in United States district courts and on appeal from adjudications interpreting and applying state legislation affecting the benefits and interests of beneficiaries of marketing of pharmacy products. As the Court of Appeals for the First Circuit has previously stated, “Article III standing is largely ... albeit not entirely ... a practical jurisprudence.” New Hampshire Hemp Council v. Marshall, 203 F.3d 1, 4 (1st Cir.2000) (citing 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.1, at 352, 362-63 (2d ed.1984)).
The basis for the foregoing conclusions is a principled proposition that applies broadly. I state explicitly, for the sake of clarity, that in my view it applies to each of the following contentions, in addition to the standing of PhRMA and the standing of PBMs to make the contention stated above:
(A) claims of violation of the Supremacy Clause;
(B) claims of violation of Dormant Commerce Clause jurisprudence (as to which, with respect to PhRMA’s standing, see also Part II.D of opinion of the Court of Appeals, delivered by Judge Bownes).
For the reasons explained in the remainder of this opinion concurring in the judgment, I would allow standing and jurisdiction but reject on the merits other specific challenges to the Maine Rx Program.
III. Madisonian Influences on Allocation of Legislative Power in the American Legal System
The roles of state legislatures and the Congress of the United States in the *88 American legal system owe much to James Madison’s seminal thinking expressed publicly and privately during debates over the structure of the new form of federalism to be established under a constitution drafted in May, 1787 to cure deficiencies in the Articles of Confederation of 1777. See generally John P. Kaminski, Ph.D., Director, and Richard Leffler, Ph.D., Co-Director, The Center for Study of the American Constitution, The University of Wisconsin-Madison (Wisconsin Study), The Origins of the Three Branches of Government, Federal Judicial Center Traveling Seminar 3-9 (2001).
Madison, a Virginian, writing to Edmund Randolph of New York on 8 April 1787, mused:
I hold it for a fundamental point that an individual independence of the States, is utterly irreconcileable with the idea of an aggregate sovereignty. I think at the same time that a consolidation of the States into one simple republic is not less unattainable than it would be inexpedient. Let it be tried then whether any middle ground can be taken which will at once support a due supremacy of the national authority, and leave in force the local authorities so far as they can be subordinately useful.
Let the national Government be armed with a positive & compleat authority in all cases where uniform measures are necessary. As in trade & c. & c. Let it also retain the powers which it now possesses.
Let it have a negative in all cases whatsoever on the Legislative Acts of the States as the K. of G.B. heretofore had. This I conceive to be essential and the least possible abridgement of the State Soveriegnties. Without such a defensive power, every positive power that can be given on paper will be unavailing. ...
Let this national supremacy be extended also to the Judiciary departmt. If the judges in the last resort depend on the States & are bound by their oaths to them and not to the Union, the intention of the law and the interests of the nation may be defeated by the obsequiousness of the Tribunals to the policy or prejudices of the States. It seems at least essential that an appeal should lie to some national tribunals on all cases which concern foreigners, or inhabitants of other States....
The supremacy of the whole in the Executive department seems liable to some difficulty. Perhaps an extension of it to the case of the Militia may be necessary and sufficient.
A Government formed of such extensive powers ought to be well organized. ...
To give the new system its proper energy it will be desirable to have it ratified by the authority of the people, and not merely by that of the Legislatures.
The Origins of the Three Branches of Government, id., at 4-5. Madison concluded these thoughts with a statement that, fearing “you will think this project, if not extravagant, absolutely unattainable and unworthy of being attempted,” he conceived it “to go no further than is essential.” Id. at 6.
In his Notes of Convention Debates, Madison records Resolutions proposed by Mr. Randolph in Convention on May 29, 1787, including a set of proposals for a form of federalism remarkably similar to Madison’s suggestions six weeks earlier.
Those Madisonian suggestions are reminders of two salient points relevant to *89 our consideration of the issues presented in the present appeal.
First. The genius of the Constitution of the United States of America is that it establishes a unique form of federalism, unlike any ever fashioned before, that harmonizes and accommodates in new and distinctive ways national and state centers of governmental power.
Second. The authority for this new form of federalism is declared by “the people, and not merely by the Legislatures.” See id. at 5.
The eighteenth-century debates in which Madison and Randolph were among the key participants occurred more than two centuries ago. Twenty-first century readers are even more removed than the lapse of time suggests from being in tune with the spirit and culture surrounding the debates over what became the Constitution of the United States and the Bill of Rights embodied in the Amendments adopted forthwith. Those debates were strikingly lively and thorough examinations of the history of peoples’ ideas and efforts to form governments powerful enough to preserve the order essential to protection of individual liberty and at the same time subject to inherent controls against abuse of power likely to lead to despotism.
Ideas about liberty and order are no less relevant now than they were when the Founders developed the Constitution of the United States of America. “The aim of the American legal system is liberty and justice for all. How close we come to that aim depends on good judging.” Robert E. Keeton, Judging in the American Legal System 1 (Lexis Law Publishing 1999).
The quality of judging in a legal system depends on commitment. It depends, first, on commitment to the aim of justice. Second, it depends on commitment to professionalism. The declared beliefs of all professionals in the system — including advocates, counselors, and academic critics as well as judges — affect the quality of judging in the system. Third, the quality of judging depends on commitment to method. Judicial choice, at its best, is reasoned choice, candidly explained.
Id. at 5. Reasoned judicial choice in the matter currently pending before us requires, in my view, that we reject plaintiffs facial challenge to the constitutionality of the Maine statute, but does not require that we consider the constitutionality of every possible interpretation or application of the Maine statute. This view is reenforced by taking into account James Madison’s contributions to federalist thought and actions. This historical background is especially relevant, in my view, to disputes over supremacy of national legislation and associated issues of interpretation of the Maine statute that was before the district court and is before us in this appeal.
IV. In the American Legal System, a State is a Sovereign
Under fundamental premises of the American legal system, the State of Maine, like all other States of the United States of America, is a sovereign. Each State has authority to govern persons and institutions and their transactions within its territorial boundaries.
I do not understand that any of the briefs before us challenges the sovereignty of states within the Union, and I do not understand the opinion of the Court of Appeals as challenging this proposition. Thus, I say no more here on the existence of sovereignty of states within the Union. Some important implications of this sovereignty, however, are noted in other sections of this opinion, infra.
*90 V. A State May Act in Multiple Roles
A sovereign State of the United States, in addition to governing, may be an active participant in a market for any kind of goods or services that it seeks to buy for its own use, including a purchase for (1) a use such as obtaining furniture for a State office and (2) a use such as obtaining pharmacy products for State-sponsored programs such as Medicaid and Medicare.
Thus, the State of Maine may act.
(1) as a sovereign,
(2) as a market participant itself because it buys pharmacy products for Medicaid patients, and
(3) in “the role of each State as a guardian and trustee for its people” who need pharmacy products at affordable prices. White v. Massachusetts Council of Constr. Employers, 460 U.S. 204, 207 n. 3, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983).
The third of these roles has special relevance to issues in this case because Maine has undertaken to represent “its people” who need pharmacy products at affordable prices.
It would be a curious irony indeed if dozens of privately organized groups of Pharmacy Benefit Managers (PBMs) could participate freely in the market for purchasing products from pharmacy product manufacturers but States ¿s guardians and trustees for their people could not because the States are also sovereign. In my view, we should make the commonsense ruling that the State of Maine as well as PBMs may participate in the market for purchasing pharmacy products.
Any conflict of interest problems that might theoretically be raised are answered in the distinctive circumstances of this case by the fact that the State of Maine faces no conflicting interests because it believes that in all its roles it is trying to serve the best interests of its people and each of the groups of its people who have an interest in and need for pharmacy products.
VI. Interpreting “Best Efforts” Provisions of the Maine Statute
A. The Statutory Maine Rx Program
By a legislative enactment in the first quarter of the year 2000, the State of Maine established The Maine Rx Program (“the program”). Maine’s Act to Establish Fairer Pricing for Prescription Drugs, 2000 Me. Legis. Ch. 786 (S.P.1026) (L.D. 2599) (“The Act”). The Act established the program “to reduce prescription drug prices for residents of the State.” Id., Me.Rev.Stat. Ann. tit. 22, § 2681 (unnumbered introductory paragraph).
The program is designed for the State to utilize manufacturer rebates and pharmacy discounts to reduce prescription drug prices. In implementing the program, the State shall serve as a pharmacy benefit manager in establishing rebates and discounts on behalf of qualified residents.
Id. (emphasis added).
The legislation was explicit in declaring program goals.
1. Program goals. The Legislature finds that affordability is critical in providing access to prescription drugs for Maine residents. This subchapter is enacted by the Legislature to enable the State to act as a pharmacy benefit manager in order to make prescription drugs more affordable for qualified Maine residents, thereby increasing the overall health of Maine residents, promoting healthy communities and protecting the public health and welfare. It is not the intention of the State to discourage employers from offering or paying for prescription drug benefits for their employ *91 ees or to replace employer-sponsored prescription drug benefit plans that provide benefits comparable to those made available to qualified Maine residents under this subchapter.
Me.Rev.Stat. Ann. tit. 22, § 2681 (emphasis added).
Some of the statutory definitions of terms are relevant to interpretive issues before us in this appeal.
2. Definitions. As used in this subchap-ter, unless the context otherwise indicates, the following terms have the following meanings.
B. “Initial discounted price” means a price that is less than or equal to the average wholesale price, minus 6%, plus the dispensing fee provided under the Medicaid program under this Title.
E. “Pharmacy benefit manager” means an entity that procures prescription drugs at a negotiated rate under a contract.
G. “Secondary discounted price” means a price that is equal to or less than the initial discounted price minus the amount of any rebate paid by the State to the participating retail pharmacy.

Id.

Also relevant to the matters before us are the statutory provisions on rebate amount.
4. Rebate amount. The commissioner shall negotiate the amount of the rebate required from a manufacturer or labeler in accordance with this subsection.
B. The commissioner shall use the commissioner’s best efforts to obtain an initial rebate amount equal to or greater than the rebate calculated under the Medicaid program pursuant to 42 United States Code, Section 1396r-8.
C. With respect to the rebate taking effect no later than October 1, 2001, the commissioner shall use the commissioner’s best efforts to obtain an amount equal to or greater than the amount of any discount, rebate or price reduction for prescription drugs provided to the Federal Government.
Id. (emphasis added).
Finally, statutory provisions on discounted prices for qualified residents, in subsection 5, are relevant to the matters before us.
B. Beginning January 1, 2001, a participating retail pharmacy shall offer the initial discounted price.
C. No later than October 1, 2001, a participating retail pharmacy shall offer the secondary discounted price.

Id.

B. Statutory Interpretation
We should be guided primarily by the plain language of all the provisions of the statute that are relevant to the issues before us, and the plain and ordinary meaning of the words used in all the relevant provisions. The relevant provisions include the definitions in the statute, the declaration of program goals, and the operational directives to Defendant/Appellant Kevin Concannon, Commissioner, Maine Department of Human Services. With these guideposts in mind, I conclude that a reasonable interpretation of the Maine statute includes the following elements:
+ The Maine statute authorizes “best efforts” of Maine administrators *92 rather than requiring prohibitive administrative decisions and actions.
+ The courts should respect the legislative drafters’ thoughtful use of the idea of “best efforts.”
+ It would be a mistake to accept the suggestions of challenges to the Maine statute that propose to interpret it in a way that, in effect, reads “best efforts” out of the statute.
The provision that opponents describe as requiring authorization for participating pharmacies to offer discounted prices to some defined group of Maine residents and obtain rebates from a state fund, created by an assessment against manufacturers, is not a statutory mandate. Instead, the statute requires only “best efforts” of Administrators to achieve the legislative aim of protecting interests of the people of Maine by ongoing creative mediation and negotiation that appeals to the executives of pharmacy products manufacturers to cooperate with Maine’s administration of legislatively authorized programs. The statutory provisions providing for “best efforts” and for “negotiation” make clear that the drafters intended the rebate process to entail negotiation and compromise between the state and the manufacturers to reach a mutually beneficial outcome. Although conceivably these “best efforts” could fail, and manufacturers could be subject to the prior authorization provisions of the statute, this outcome is not mandated by the language of the statute, and it is not necessary, in a facial challenge to 'the statute, to reach questions that may be presented in the future if “best efforts” fail.
As a practical matter, it is obvious that many, probably most, citizens of Maine who have a need for pharmacy products but have less than the economic resources of, say, the top ten percent of citizens of the state, do not have adequate resources and practical means to get the pharmacy products they need unless
(i) by travel to Canada, or
(ii) by mail, or
(iii) in some other way that involves aid or assistance comparable to that PBMs provide.
If these citizens have a need for prescription medication, and choose to forgo that medication rather than resort to these resources, it may well be in the interests of PhRMA members to negotiate with the State of Maine. In light of allegations made in their submissions, I infer that PhRMA members believe that a rebate in the amount of the Medicaid rebate would not be in their best interest, but the plain language of the statute allows for negotiation in a way that will serve the best interests of both PhRMA members and previously unrepresented citizens of the State of Maine.
VII. The Timing of Adjudications on Constitutionality
The Maine statute, interpreted in the way explained in Part VI, is consistent with all State and Federal constitutional doctrines and is permissible legislation. The district court’s ruling to the contrary must be vacated. No federal law (constitutional, statutory, or decisional) preempts and thus forbids reasonable implementation of Me.Rev.Stat. Ann. tit. 22, § 2681.
Properly interpreted, that law is compatible with rather than conflicting with federal Medicaid legislation and administrative supervision of Medicaid.
It is error to say — as is said in Defendants/Appellants’ Brief at page 18 — that the extent to which the Act advances the purposes of Medicaid is irrelevant Also, it is error to say that the “proper question” in this appeal “is whether the Act conflicts with the purposes of Medicaid,” as Defen *93 dants/Appellants’ Brief asserts at page 18. The core question is multifarious, not singular. An evaluative legal test applies, not a bright-line elements legal test.
Plaintiff/Appellee proposes in its waiver and preclusion arguments that we should hold that the fact that Defendants/Appellants make these fallacious arguments bars relief to Defendants/Appellants in this appeal. I would reject this, argument. It does not state a valid reason for depriving the citizens of Maine of a fair adjudication of their interests at stake in this appeal, based on a proper interpretation of the Maine statute. Our federal system permits a State’s advocacy in court in support of its interests and those of its people. Penalizing a state and its people whenever the state makes an argument rejected by the court is not appropriate.
Other arguments presented by Defendants/Appellants both here and in the district court are consistent with the interpretation of the Maine statute explained in Part VI of this opinion and support reversal of the judgment of the district court.
An unstated but implicit premise of PlaintifflAppellee’s position in this case is that all Plaintifi/Appellee need do to succeed in a facial challenge to the Maine Act is to show that the administration of the Act is putting pressure on Plaintiff Appel-lee, thus making its choice about how it responds to the circumstances developing under ongoing administration of the Act not entirely voluntary.
The fallacy of that position stems from the fact that few choices of individuals and entities in a geographical territory that has a government are entirely voluntary. True, some transactions are beyond governmental authority to intrude. They are “transactions beyond law” in the sense that individuals and private (non-governmental) entities they create and maintain have a large range of freedom under law to do as they please without governmental intrusion on that freedom. But a demand by any individual or entity for entire freedom is fundamentally in conflict with having a government that maintains the order essential to protection of individual freedom.
It is possible, as explained in Part VIII, infra, to fashion remedies for any threats that may arise from overstepping the bounds of statutorily authorized “best efforts” of Maine’s Commissioner of Human Services during the ongoing administration of the Maine Rx Program. It is appropriate to wait and see what happens, and fashion appropriate remedies for any overstepping, rather than declaring Maine’s Act unconstitutional because of an outside chance that something beyond constitutional bounds will be attempted unless an advance declaration of facial invalidity of the statute by the district court is allowed to stand.
VIII. Remedies for Threats to Overstep Statutory Authorization
A United States district court, confronted with a facial challenge to validity of a state statute on grounds like those asserted in this case, should dismiss the facial challenge for failure to meet the requirements of applicable precedents.
The court might also find it appropriate to declare explicitly that the dismissal on this ground would not be a bar to an otherwise properly supported claim for relief against a threatened administrative overstepping of the bounds of the statutory authorization for administrative “best efforts” to negotiate and implement a suitable accommodation of legitimate interests by methods acceptable to Maine’s Commissioner of Human Services, acting both for the State and as a PBM for its people, and *94 to manufacturers of pharmacy products who wish to market their products in Maine consistently with the Maine Rx Program.
The decision would be one to wait and see, and act then if needed, instead of prohibiting legislatively sponsored administrative aid to the people of Maine because of a possibility that at some time in the future some administrator will overstep the bounds of the legislative authorization.
For example, acting under this wait-and-see principle, the Court of Appeals would vacate the District Court’s preliminary injunction, but at the same time declare that its ruling would not stand as a bar to renewed proceedings in the District Court if at some future time the Legislative or Executive Branch of the sovereign State of Maine, or an Administrative Agency authorized to act to serve the declared legislative aim of the statute in issue, takes action that is an imminent threat to legally protected interests of a person or entity (including any out-of-state as well as any in-state person or entity) claiming a right to market pharmacy products in Maine. An as-applied challenge to state legislation is a more flexible instrument of adjudication, more capable of reaching an outcome tailored to the circumstances and needs of a case at hand than the all-or-nothing nature of a facial challenge to validity.
A federal district or appellate court’s acting in advance of overstepping, because of the possibility overstepping might occur in the future, is fundamentally inconsistent with the body of precedents establishing the elements of a successful facial challenge in a federal court to the consistency of a state statute with potentially preemptive federal law. See, e.g., California Coastal Comm’n v. Granite Rock Co., 480 U.S. 572, 579-80, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (holding that state permit requirements were not preempted by federal law, and stating that the party arguing in favor of preemption would have to demonstrate “that there is no possible set of conditions that the [state] could place on its permit that would not conflict with federal law — that any state permit requirement is per se preempted”) (underscoring added). These precedents would require PhRMA to demonstrate “that there is no possible” application of the statute that would not conflict with the structure and purpose of Medicaid. PhRMA cannot meet this burden. It could not do so even if we softened the legal standard a bit by substituting “reasonably likely” for “possible.” PhRMA’s facial challenge must be denied.
A federal court’s acting in advance of overstepping by state officials, and responding to a facial challenge, is also inconsistent with relevant precedents for a facial challenge on constitutional grounds. In United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court stated that “a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” Id. at 745, 107 S.Ct. 2095.
It is true that the Salerno decision has been criticized in later opinions of some Justices of the Supreme Court. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 740, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments) (declaring that the Court has never in fact applied “such a strict standard.”); Janklow v. Planned Parenthood, 517 U.S. 1174, 1175-76, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J., respecting the denial of the petition for certiorari) (calling the Salerno decision “draconian” and declaring that it “does not accurately characterize *95 the standard for deciding facial challenges”)-
Salerno, nevertheless, continues to be cited by both the Supreme Court and the Courts of Appeals. See, e.g., Anderson v. Edwards, 514 U.S. 143, 155 n. 6, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995); Reno v. Flores, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). We need not reach the issue of the applicability of the Salerno test, however, because the statute in this case, as explained in Part VI of this opinion, is capable of an interpretation and an application that is respectful of limits imposed by the Constitution.
The application of facial-challenge jurisprudence in the circumstance of this case before the District Court and in this appeal is, in practical effect, a considerable stretch beyond any thus-far-successful facial challenge. If such an extension of the jurisprudence of facial challenges expressed in decisions of the Supreme Court of the United States is to occur, it is more appropriate that it occur in an opinion of that Court than in an opinion of a Court of Appeals.
My own reading of the array of Supreme Court opinions on this subject, even in light of the ongoing differences both within the Court and among scholars on the applicability of the Salerno test, is that precedent points away from rather than toward softening in any way the rigorous requirements for presenting a successful facial challenge to validity of a state statute.
This conclusion is supported not only by the opinions explicitly reasoned as part of the facial-challenge jurisprudence but also by other ongoing developments of federal law.
One ongoing development supportive of the conclusion I propose is the resurgence in recent years of emphasis on the respect that inferior federal courts are directed to show for the freedom of the people of a locality and local governmental institutions to make their own decisions. For illustrative citations, see Part IX of this opinion, infra. See also the Madisonian principles identified in Part III, supra. This emphasis is in part a feature of the distinctive version of federalism underlying what is commonly called the American legal system. It is associated with the Supreme Court’s invoking the Commerce Clause not for the ordinary purpose of sustaining federal legislation but to strike down state legislation. This emphasis on federalism weighs in favor of sustaining rather than striking down the Maine Rx Program, as explained in Part IX, infra.
IX. The Commerce Clause and Concerns of Federalism
The Brief of Washington Legal Foundation and five other associations as Amici Curiae in support of affirming the preliminary injunction ordered by the District Court for the District of Maine argues that the District Court was correct in “find[ing] that the [Maine Rx] Program violated the Commerce Clause because it attempted to regulate transactions taking place solely outside the State,” and in adding, “Maine may have power over what pharmacies later do here in Maine, or over the few distributors who transact business in Maine, but it has no power to regulate the price paid in earlier transactions in other states.” Brief of Washington Legal Foundation et al. at 6.
A similar position is developed in the Brief Amicus Curiae of the Chamber of Commerce of the United States in Support of Appellee Recommending Affirmance.
*96 The Commerce Clause [of the United States Constitution] provides that “[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States.... ” Art. I, § 8, cl. 3. It is long established that, while a literal reading evinces a grant of power to Congress, the Commerce Clause also directly limits the powers of the States.... [Wyoming v. Oklahoma, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (citing authorities).]
Brief Amicus Curiae of the Chamber of Commerce of the United States in Support of Appellee Recommending Affirmance at 7. The citations relied upon include the following:
Healy v. The Beer Institute, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (“a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State’s authority and is invalid regardless of whether the statute’s extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.”); see generally Laurence H. Tribe, American Constitutional Law, § 6-12 at 1098 (3d ed.2000) (referencing “the per se principle against extraterritorial state regulation”).
Id. at 9.
These arguments are classic illustrations of the controversial efforts that have occurred from time to time to treat the Commerce Clause not only as authorizing legislation by the Congress of the United States but also as constraining state legislation.
Consider, for example, a case emphasized in the Brief of the Chamber of Commerce, Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Unlike the case before us, this was a direct clash between two States of the Union. Wyoming, a major coal-producing State, though not a seller of coal, imposed a severance tax on those who extracted coal. The dirfect impact of that severance tax on the price of Wyoming coal purchased by four Oklahoma electric utilities was obvious. The Oklahoma legislature passed an act requiring coal-fired electric utilities in Oklahoma to burn a mixture containing at least 10% Oklahoma-mined coal. The utilities reduced their purchases of Wyoming coal. Wyoming’s severance tax revenues declined. Wyoming sought relief under the original jurisdiction of the Supreme Court of the United States. The Court accepted Wyoming’s complaint and held the Oklahoma act invalid under the “negative” aspect of the Commerce Clause on the reasoning that it “prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.” Id. at 454, 112 S.Ct. 789. Even so, the Court added that a clearly discriminatory statute will be struck down “unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism,” citing Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).
I need not and do not consider whether the case before us would qualify for the exception. Instead, I conclude that the case before us is not one subject to the “negative” rule itself, quite apart from the exception.
Wyoming v. Oklahoma and other opinions of the Supreme Court that have gone farthest in the direction of a “negative” application of the Commerce Clause do not support the proposition that a federal court acts properly when it disregards all the indicia of the State’s purpose in establishing the Maine Rx Program to regulate *97 transactions within the territorial boundaries of Maine and to protect the health of the people of Maine. In these circumstances a federal court does not act properly when it makes a judicial “finding” that the State’s declaration of purpose is a facade and the real purpose was “to regulate the price paid in earlier transactions in other states.”
First. The legislative aim of the Act was fully stated in the Act itself, as explained in Part VI.A of this opinion, supra. This is not a case of hidden or obscure aims.
Second. Any suggestion to the contrary in briefs before this court is in disregard of our obligation, and that of the District Court, in reading the statute, to be guided, as stated in Part VLB of this opinion, by the plain language of the statute, the definitions in the statute, and the plain and ordinary meaning of the words used in the declaration of program goals, in the statutory definitions, and in the operational directives to Maine’s Commissioner of Human Services. See Whiting v. Town of Westerly, 942 F.2d 18, 21 n. 3 (1st Cir.1991) (“In evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered.”).
Third. As stated in Part VLB, the provision of the Maine Act that opponents describe as requiring authorization for participating pharmacies to offer discounted prices to some defined group of Maine residents and obtain rebates from a state fund, created by an assessment against manufacturers, is not a statutory mandate. Instead, if is a statement of aim. The statute requires only “best efforts” of Administrators to achieve the legislative aim of protecting interests of the people of Maine by ongoing creative mediation and negotiation.
Fourth. As stated in Part VI.B, many and probably most citizens of Maine who have a need for pharmacy products would not have adequate resources and practical means to get the pharmacy products they need absent the Maine Rx Program. In the course of the creative mediation and negotiation required by the statute, the pharmaceutical companies themselves may find it is in their best interests to enter into agreements to allow them to reach this previously untapped market for their products.
Fifth. In view of the foregoing four points, it cannot be proper for a federal court to make judicial “findings” contrary to Maine’s legislative declarations and on that basis declare that Maine’s Act is invalid because “it attempted to regulate transactions taking place solely outside the State” and attempted “to regulate the price paid in earlier transactions in other states.” In so doing, the District Court acted beyond its authority.
The ideals of federalism explained above weigh in favor of respect for a state’s experimentation and respect for a state’s sovereignty. The precedents that govern our examination and that of the District Court of a facial challenge to state legislation are consistent with these ideals of federalism, and indeed are consistent with the delicate balance of power explained by Madison in his eai’ly writings.
The District Court’s preliminary injunction must be vacated.
X. Conclusion and Order
The decision I would make, for the reasons explained in this concurring opinion, would not bar further proceedings, either in the civil action in which the preliminary injunction was issued or in a civil action newly filed at some future time, if at that time a showing could be made by the complaining party that the Legislative or Executive Branch of the sovereign State of *98 Maine, or an Administrative Agency authorized to act to serve the declared legislative aim of the statute in issue, had taken action that is a threat to legally protected interests of a person or entity (including any out-of-state as well as any in-state person or entity) making the complaint. That person or entity might appropriately seek a form of limited injunctive relief needed to protect identified interests without deeper intrusions on the State of Maine’s legitimate interests than would be necessary and appropriate for that purpose.
For the reasons stated in this opinion, the District Court’s preliminary injunction should be vacated, and I concur in the judgment of the Court of Appeals, delivered by Judge Bownes, so ordering.