19-3962-cv
New York v. Yellen

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2020

(Argued: December 3, 2020          Decided: October 5, 2021)

Docket No. 19-3962-cv

_____

STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF MARYLAND, STATE OF NEW JERSEY,

Plaintiffs-Appellants,

v.

JANET YELLEN, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF TREASURY, UNITED STATES DEPARTMENT OF TREASURY, CHARLES P. RETTIG, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE UNITED STATES INTERNAL REVENUE SERVICE, UNITED STATES INTERNAL REVENUE SERVICE, AND UNITED STATES OF AMERICA,

Defendants-Appellees.[*]

_____

Before:

SACK, CHIN, and LOHIER, Circuit Judges.

New York, Connecticut, Maryland, and New Jersey (the "Plaintiff States") appeal from a judgment of the United States District Court for the Southern

---

[*] The Clerk of Court is directed to amend the caption of this case as set forth above.

District of New York (Oetken, J.) granting the defendants' motion to dismiss for failure to state a claim and denying the States' cross-motion for summary judgment. The States allege that the $10,000 cap on the federal income tax deduction for money paid in state and local taxes, enacted as part of the 2017 Tax Cuts and Jobs Act, violates the United States Constitution. They argue that the state and local tax deduction is constitutionally mandated, or alternatively that the cap violates the Tenth Amendment because it coerces them to abandon their preferred fiscal policies. The District Court held that the States had standing and that their claims were not barred by the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), but it concluded that the claims lacked merit. We agree with the District Court, and we therefore **AFFIRM** the judgment.

> CAROLINE A. OLSEN, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, on the brief), for Letitia James, Attorney General for the State of New York, New York, NY, for Plaintiff-Appellant State of New York.
>
> Mark F. Kohler, Assistant Attorney General, for William Tong, Attorney General for the State of Connecticut, Hartford, CT, for Plaintiff-Appellant State of Connecticut.
>
> Steven M. Sullivan, Solicitor General, for Brian E. Frosh, Attorney General for the State of Maryland, Baltimore, MD, for Plaintiff-Appellant State of Maryland.
>
> Jeremy Feigenbaum, Counsel to the Attorney General, for Gurbir S. Grewal, Attorney General for the State of New Jersey, Trenton, NJ, for Plaintiff-Appellant State of New Jersey.
>
> JEAN-DAVID BARNEA, Assistant United States Attorney (Rebecca S. Tinio, Benjamin H. Torrance, Assistant United States Attorneys, on the brief), for Audrey

2

Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, for Defendants-Appellees.

LOHIER, Circuit Judge:

The federal tax code's state and local tax ("SALT") deduction has long permitted taxpayers to deduct from their taxable income all the money they paid in state and local income and property taxes. In 2017, however, Congress passed the Tax Cuts and Jobs Act (the "2017 Tax Act" or the "Act"), Pub. L. No. 115-97, 131 Stat. 2054, which imposed a $10,000 cap on the SALT deduction. The immediate impact of the new cap was felt most acutely in States where the state and local tax liability of residents often exceeds the $10,000 maximum. Four of the States most affected—New York, Connecticut, New Jersey, and Maryland, the plaintiffs here—sued the federal Government,[1] asserting that Congress's new cap on the SALT deduction either is unconstitutional on its face or unconstitutionally coerces them to abandon their preferred fiscal policies. The Government responded that the United States District Court for the Southern

---

[1] The defendants include the Internal Revenue Service and its Commissioner and the United States Department of Treasury and its Secretary.

District of New York (Oetken, J.) lacked subject matter jurisdiction to consider the States' claims, and also defended the cap on the merits.

The District Court rejected the Government's jurisdictional defense but dismissed the complaint for failure to state a claim. On appeal, the Plaintiff States argue that the District Court erred on the merits, while the Government continues to maintain that the District Court lacked jurisdiction and otherwise defends the District Court's judgment. Finding no error in the District Court's conclusions, we AFFIRM.

## BACKGROUND

### I.

We start with a quick bit of history. The United States has not always levied a federal income tax. In its first decades, the federal Government remained small enough that it could fund itself almost entirely through customs duties and tariffs. See Aaron T. Knapp, The New Jersey Plan and the Structure of the American Union, 15 Geo. J.L. & Pub. Pol'y 615, 643–44 (2017). The cost of waging the Civil War made that approach impossible. Congress, prodded by the need to tap new sources of revenue to pay for the war, enacted the first federal income tax in 1861. See Act of Aug. 5, 1861, ch. 45, § 49, 12 Stat. 292, 309. Even

then, as the Government scrounged for funds first to pay for and then to recover from the war, Congress created a nearly unlimited SALT deduction. "[I]n estimating [federally taxable] income," Congress determined, "all national, state, or local taxes assessed upon the property, from which the income is derived, shall be first deducted." Id.; see Act of July 1, 1862, ch. 119, § 91, 12 Stat. 432, 473–74; Act of June 30, 1864, ch. 173, § 117, 13 Stat. 223, 281; Act of Mar. 3, 1865, ch. 78, 13 Stat. 469, 479; Act of Mar. 2, 1867, ch. 169, § 13, 14 Stat. 471, 478; Act of July 14, 1870, ch. 255, § 9, 16 Stat. 256, 258. The tax expired in 1872, but Congress revived it in 1894, along with the SALT deduction. See Act of July 14, 1870, § 10, 16 Stat. at 158; Act of Aug. 27, 1894, ch. 349, § 28, 28 Stat. 509, 553. A year later, in 1895, the Supreme Court struck down the 1894 tax, holding that it violated the constitutional prohibition against direct taxes not apportioned among the States in proportion to their relative populations. See Pollock v. Farmers' Loan & Tr. Co., 158 U.S. 601, 637 (1895); see also U.S. Const. art. I, § 9, cl. 4.

The ratification of the Sixteenth Amendment in 1913 empowered Congress to "lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States." U.S. Const. amend. XVI. Immediately after the Amendment was ratified, Congress reinstated the federal income tax

and reintroduced the SALT deduction for "all national, State, county, school, and municipal taxes paid within the year, not including those assessed against local benefits."  Act of Oct. 3, 1913, ch. 16, § II(B), 38 Stat. 114, 167.

And "from then to now, some form of [SALT] deduction . . . has been a mainstay of the federal Tax Code."  New York v. Mnuchin, 408 F. Supp. 3d 399, 404 (S.D.N.Y. 2019).  But amendments to the Tax Code have over time also made the deduction more difficult or less attractive for taxpayers to claim.  In 1944, for example, Congress introduced the standard deduction, which is a predetermined sum that taxpayers can choose to deduct instead of deducting their identifiable itemized expenses.  See Individual Income Tax Act of 1944, Pub. L. No. 78-315, § 9, 58 Stat. 231, 236–38.  As the District Court noted, the emergence of the standard deduction "meant that, in practice, the SALT deduction remained relevant for only those taxpayers who chose to itemize their deductions."  Mnuchin, 408 F. Supp. 3d at 404.  Twenty years later, in 1964, Congress altered the SALT deduction directly: it provided that only certain enumerated types of state and local taxes were deductible and disallowed deductions for any other state and local taxes.  See Act of Feb. 26, 1964, Pub. L. No. 88-272, § 207, 78 Stat. 19, 40–42; see also Gladriel Shobe, Disaggregating the State and Local Tax

Deduction, 35 Va. Tax Rev. 327, 338 (2016). In effect, the 1964 amendment inverted the traditional legislative approach to the SALT deduction under which "all state and local taxes were deductible unless specifically disallowed." See Shobe, supra, at 338 (emphasis added).

Since 1964, legislation has only further limited the availability of the deduction. In 1986, in the wake of a debate about repealing the deduction, Congress enacted a comprehensive alternative minimum tax ("AMT") scheme, providing taxpayers with an additional method to calculate their tax liability without resorting to the deduction. See Tax Reform Act of 1986, Pub. L. No. 99-514, § 134, 100 Stat. 2085, 2320–45. The AMT requires high-income taxpayers to calculate their tax liability using both traditional and alternative methodologies, and to pay the greater amount. If the alternative methodology results in a greater tax liability, the taxpayer is prevented from claiming the SALT deduction. See id. at 2321. At the same time, Congress removed sales taxes from the list of deductible state and local taxes. See id. § 134, 100 Stat. at 2116. Not long thereafter, in 1990, Congress enacted the so-called "Pease limitation," under which taxpayers with adjusted gross incomes exceeding certain specified thresholds were required to reduce the overall amount claimed in itemized

deductions, including SALT deductions, by up to eighty percent. See Omnibus Budget Reconciliation Act, Pub. L. No. 101-508, § 11,103, 104 Stat. 1388, 1388-406 (1990) (codified at 26 U.S.C. § 68(a)). Finally, in 2004 Congress reinstated the deduction for state and local sales taxes but forced taxpayers to choose between deducting state and local sales taxes and deducting state and local income taxes, thereby reducing the number of taxpayers claiming the latter. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 501, 118 Stat. 1418, 1520–21.

The SALT deduction nevertheless remained durable until 2017. Eligible taxpayers could, subject to the standard deduction, the AMT, and the Pease limitation, always elect to deduct all state and local real and personal property taxes as well as either all state and local income taxes or all state and local sales taxes. See 26 U.S.C. § 164(a)(1)–(3), (b)(5) (effective Dec. 18, 2015 to Dec. 21, 2017).

In 2017, however, Congress took a sharp turn by passing the Act. As relevant here and as noted above, the Act prohibits taxpayers from claiming a SALT deduction of more than $10,000 — a cap that exists regardless of a taxpayer's state and local tax burden. See 2017 Tax Act § 11,042, 131 Stat. at

2085–86 (codified at 26 U.S.C. § 164(b)(6)).[2] Congressional and executive branch proponents of the new cap on the SALT deduction openly proclaimed that it would adversely impact States with higher overall state and local taxes significantly more than other States. According to then-Speaker of the House Paul Ryan, for example, the SALT deduction had created a disparity in which "[p]eople in states that have balanced budgets, whose state governments have done their job and kept their books balanced and don't have massive pension liabilities, they're effectively paying for states that don't." Joint App'x 575; see also id. at 612 ("[W]e're propping up profligate, big government states and we're having states that actually got their act together pay for states that didn't."). Another member of Congress asserted that the Act would not be "as good" for "New Jersey, New York, and other states that have horrible governments." Id. at 616. Then-Treasury Secretary Mnuchin "hope[d]" that the SALT deduction cap would "send[] a message to the state governments that, perhaps, they should try to get their budgets in line" and implied that "13 or 14% taxes" are unacceptably high. Id. at 621. And President Trump stated that the new law "creat[es] an

---

[2] The Act's $10,000 cap on the SALT deduction is scheduled to sunset after the 2025 taxable year, see 26 U.S.C. § 164(b)(6), at which time the Pease limitation, which the Act suspended, is scheduled to resume, see 2017 Tax Act § 11,046, 131 Stat. at 2088 (codified at 26 U.S.C. § 68(f)).

incentive" for state politicians to "do a good job of running [their] state." Id. at 582–83.

II.

The Plaintiff States commenced this action to enjoin the Government from enforcing the SALT deduction cap, claiming that it violates the Sixteenth Amendment. They argued that any federal income tax must permit "a deduction for all or a significant portion of state and local taxes." Joint App'x 59. They also claimed that the SALT deduction cap violates both Article I, Section 8 and the Tenth Amendment because it coerces them to lower taxes or cut spending.

The Plaintiff States contend that taxpayers in their states are likely to bear the brunt of the cap, as a disproportionate share of their taxpayers' state and local tax burdens exceed the $10,000 maximum. According to them, the cap increases the effective cost of state and local property taxes, renders homeownership more expensive, depresses home equity values, and slows the real estate market in their respective states. As a result, the Plaintiff States say, they will collect reduced revenue from property taxes and real estate transfer

10

taxes, which will force them to significantly reorder their fiscal and tax policies to make up for the shortfalls.

Before the District Court, the Government moved to dismiss these claims on the ground that the Plaintiff States lacked standing, that their claims presented a non-justiciable political question, and that the claims were in any event barred by the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a). As noted, although the District Court rejected the Government's jurisdictional arguments, it held that the Constitution does not require a SALT deduction as part of every federal income tax scheme and that the complaint failed to assert a plausible claim of coercion.

This appeal followed the District Court's judgment dismissing the complaint.

DISCUSSION

I.

We review the District Court's entire decision de novo. Before considering the merits of the Plaintiff States' claims, we must first address the Government's

jurisdictional arguments that the States lack standing to sue and that this action is barred by the AIA.[3]

A.

We agree with the District Court that the Plaintiff States have standing to proceed with their constitutional claims. To satisfy the "'irreducible constitutional minimum' of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of litigation," and at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." Lujan, 504 U.S. at 561. Where, as here, the defendants' challenge to the plaintiffs' standing is "facial," meaning that the defendants do not offer any evidence of their own, our task is to determine whether, "accepting as true all material factual allegations of

---

[3] The Government does not press on appeal its alternative jurisdictional argument that this case presents a non-justiciable political question, and as a result we do not address that argument.

12

the complaint, and drawing all reasonable inferences in favor of the plaintiff[s]," the complaint "alleges facts that affirmatively and plausibly suggest that the plaintiff[s] ha[ve] standing to sue." Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016) (quotation marks omitted). The Government does not dispute that "any injuries the States suffer as a result of the SALT cap are traceable to the Government's enforcement of the cap and so would be remedied by an injunction that bars enforcement." Mnuchin, 408 F. Supp. 3d at 408. The question of standing therefore turns solely on whether the Plaintiff States have sufficiently alleged an injury in fact.

The Plaintiff States principally argue that they have standing because the SALT deduction cap is estimated to cause them to lose at least hundreds of millions of dollars of revenue from property taxes and real estate transfer taxes. In addressing the argument, we consider Wyoming v. Oklahoma. 502 U.S. 437, 447–48 (1992). There, Wyoming challenged an Oklahoma law that required coal-fired power plants in Oklahoma to burn a mixture of coal at least ten percent of which was mined in-state. Id. at 440, 444. Before Oklahoma enacted the law at issue, its utilities "exclusively us[ed] Wyoming coal." Id. at 443, 448 n.9. But the Oklahoma law reduced the demand for Wyoming coal, causing Wyoming to lose

13

significant revenue from severance taxes, which were assessed as a percentage of the fair market value of all coal mined in the state. See id. at 442, 445. The Supreme Court held that Wyoming had standing to challenge the Oklahoma law because it had demonstrated a "direct injury in the form of a loss of specific tax revenues." Id. at 448.

The Government attempts to distinguish Wyoming, arguing that it recognizes only a very narrow exception to the general rule that a reduction in tax revenues constitutes a generalized grievance that is not cognizable for purposes of standing. Narrow or not, the "exception" to the rule applies here. The Plaintiff States allege that the SALT deduction cap, among other effects, makes homeownership more expensive for taxpayers whose state and local tax liability exceeds $10,000: the cap prohibits taxpayers from deducting the full amount of their property taxes from their federally taxable income, thereby increasing their federal income tax liability. Because it makes homeownership more expensive, the cap reduces demand in the housing market, causing lower prices and fewer sales, and leads to specific losses in tax revenue derived from property and real estate transfer taxes.

14

Setting Wyoming aside, the Government casts about to analogize this case to a smattering of cases in which our sister circuits held that a State or foreign government lacked standing. But the cases to which the Government points us all involve allegations of generalized economic harm only, not, as here and in Wyoming, allegations detailing specific reductions in tax revenue. See Arias v. DynCorp, 752 F.3d 1011, 1015 (D.C. Cir. 2014) (alleging that the defendant's conduct generally "cost them tax revenue," as estimated by new budget deficits); Iowa ex rel. Miller v. Block, 771 F.2d 347, 353 (8th Cir. 1985) (alleging that if disaster-relief programs were not implemented, "agriculture production will suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down"); Pennsylvania ex rel. Shapp v. Kleppe, 533 F.2d 668, 670–72 (D.C. Cir. 1976) (alleging that the Small Business Administration's failure to introduce a more effective and longer-lasting disaster-relief program caused "injury to [the state's] economy" and "reduction of state tax revenues").

And in both Wyoming v. United States Department of Interior, 674 F.3d 1220 (10th Cir. 2012), and Stewart v. Kempthorne, 554 F.3d 1245 (10th Cir. 2009), on which the Government also relies, the state plaintiffs failed to plausibly allege

15

that they had lost or would lose specific tax revenues. See Wyoming v. U.S. Dep't of Interior, 674 F.3d at 1234; Stewart, 554 F.3d at 1254. Neither of these cases, however, involved the combination of "[b]asic economic logic," Am. Inst. of Certified Pub. Accts. v. IRS, 804 F.3d 1193, 1198 (D.C. Cir. 2015), and declarations from tax and budgetary experts that exists in the case before us, see McCardell v. U.S. Dep't of Hous. & Urb. Dev., 794 F.3d 510, 520 (5th Cir. 2015). Here, for example, New York provided a specific estimate that the SALT deduction cap will cause New York's real estate transfer tax revenue to decrease by $15.3 million in 2019 and $69.2 million in 2020. Joint App'x 69. Maryland specifically estimated that the 2017 Tax Act would cause Maryland's real estate transfer tax revenue to decrease by $52.3 million in two years. Id. at 95. And New Jersey supplied expert declarations estimating that the 2017 Tax Act would cause New Jersey's real estate transfer tax revenue to decrease by a total of $105.1 million in 2019 and 2020. Id. at 150. Here, in other words, the Plaintiff States, which claim that the new tax burden will significantly decrease the tax revenue from residents, are not engaged in "pure speculation and fantasy," Lujan, 504 U.S. at 567. Far from "guesswork as to how independent decisionmakers" – their own residents – "will exercise their judgment," Clapper v. Amnesty Int'l USA,

16

568 U.S. 398, 413 (2013), the chain of economic events that the Plaintiff States have proffered in this case strikes us as realistic, and the challenged action's effect on their residents' decisions seems to us entirely "predictable," Dep't of Commerce v. New York, — U.S. —, 139 S. Ct. 2551, 2566 (2019).

For these reasons, we conclude that the Plaintiff States have standing to sue the Government and challenge the SALT deduction cap. Their allegations that the cap will decrease the frequency and price at which taxable real estate transactions occur by measurably increasing the cost of those transactions reflect specific lost tax revenues and suffice to support standing.

B.

We are similarly unpersuaded by the Government's jurisdictional argument under the AIA. As relevant here, the AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). "The manifest purpose of [the AIA] is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." Enochs v. Williams

Packing & Navigation Co., 370 U.S. 1, 7 (1962); see also United States v. First Nat'l City Bank, 568 F.2d 853, 856 n.10 (2d Cir. 1977).

The Government argues that the AIA bars this lawsuit as a "suit for the purpose of restraining the assessment or collection of any tax." Appellee's Br. 22–28. But its argument ignores that the AIA was never intended to leave a party without any forum in which to assert its tax claims.

Consider South Carolina v. Regan, 465 U.S. 367, 373 (1984), in which the Supreme Court held that the AIA does not apply to tax claims that the plaintiff could not assert elsewhere. See Larson v. United States, 888 F.3d 578, 587 n.11 (2d Cir. 2018). There, South Carolina sought an injunction against the federal Tax Equity and Fiscal Responsibility Act, which taxed the interest on certain state-issued, unregistered bearer bonds, while interest on state-issued registered bonds remained non-taxable. See Regan, 465 U.S. at 371. South Carolina challenged the tax, asserting that it "destroy[ed South Carolina's] freedom to issue obligations in the form that it chooses." Id. at 371–72. The Government responded, as it does here, that the AIA barred South Carolina's claim. After reviewing the history of the AIA and its amendments, however, the Supreme Court held that the AIA does not bar "actions brought by aggrieved parties for whom [Congress] has not

18

provided an alternative remedy." Id. at 378. South Carolina's challenge, the Court explained, could proceed in federal court because "Congress ha[d] not provided the plaintiff with an alternative legal way to challenge the validity of a tax." Id. at 373.

With respect to the applicability of the AIA, the claims of the Plaintiff States and those of South Carolina in Regan are materially the same. To begin, the Plaintiff States cannot assert their claims in a forum other than federal court and cannot themselves bring a refund suit here. Moreover, as Regan reminds us, the AIA applies "only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." Id. at 381 (emphasis added). Aggrieved parties are not obliged to find taxpayers willing to litigate their claims and trust that those taxpayers will litigate them effectively. Id. at 380. We do not "lightly attribute to Congress an intent to require plaintiff[s] to find a third party to contest [their] claims." Id. at 381. Because the Plaintiff States must be permitted to pursue their claims on their own behalf, it seems to us irrelevant that a third party may have an incentive to challenge the SALT deduction cap in a refund suit even if the Plaintiff States cannot. Id. at 380–81.

19

The Government attempts to confine Regan to those "narrow circumstances" in which taxpayers have "little incentive" to incur and challenge the disputed tax. Appellees' Br. 24. But Regan appears to have carved an exception to the AIA that is not quite as narrow as the Government claims. As the Court explained in Regan, there is no guarantee that a taxpayer willing to challenge the disputed tax will "present the relevant arguments on [the State's] behalf," as opposed to arguments that highlight the taxpayer's more individual interests. Id. at 380 (quotation marks omitted).

Continuing to press its argument that the AIA bars this lawsuit because there are alternative ways for the Plaintiff States to advance their claims, the Government relies on two decisions from our sister circuits, RYO Machine, LLC v. United States Department of Treasury, 696 F.3d 467 (6th Cir. 2012), and Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau, 843 F.3d 810 (9th Cir. 2016). As with the other decisions on which the Government relies to advance its jurisdictional arguments, both RYO Machine and Yakama Indian Nation are distinguishable.

First, in RYO Machine, the Sixth Circuit considered a suit by manufacturers and a retailer of high-speed cigarette rolling machines to enjoin

enforcement of a rule taxing the retailers as "manufacturers of tobacco products." RYO Machine, 696 F.3d at 468–69. The court held that the manufacturers were not entitled to injunctive relief and distinguished the case from Regan. Unlike Regan, where South Carolina "sought to preserve its own ability to issue unregistered bonds," the Sixth Circuit explained, the manufacturers sought "to preserve the position of their customers and thereby to protect themselves from lost profits." Id. at 472. In other words, the rule may have injured the manufacturers, but the manufacturers' lawsuit aimed to vindicate the rights of their retailers. Here of course, the Plaintiff States — like South Carolina in Regan — contend that the SALT deduction cap violates their own constitutional rights. And unlike RYO Machine, in which one of the retailers subject to the tax "was originally part of th[e] lawsuit," id., the Plaintiff States have not litigated this case jointly with taxpayers. Indeed, the Government has not identified a single taxpayer challenge to the SALT deduction cap.

In Yakama Indian Nation, a Native American tribe, a tobacco manufacturer organized under tribal laws, and the individual owner of the manufacturer (himself a tribal member) jointly sued for injunctive and declaratory relief barring the imposition of a federal tobacco excise tax on the

21

manufacturer on the ground that the tax violated the General Allotment Act, 25 U.S.C. § 331 et seq., as well as the Treaty with the Yakama, 12 Stat. 951 (1855). See Yakama Indian Nation, 843 F.3d at 811. The Ninth Circuit concluded that the suit was barred by the AIA. The court explained that unlike South Carolina's interest in Regan, "the Yakama Nation's asserted injury flows from the taxation of its members, and thus is wholly derivative" of the injury suffered by the corporate and individual tribal members and taxpayers who litigated the case jointly with the tribe. Id. at 815. The manufacturer and its owner, in other words, "share[d] the Yakama Nation's interest in preventing taxation" and "appear[ed] to have every incentive to raise [the Yakama Nation's] claims in a refund suit." Id. Indeed, the Ninth Circuit asserted, the Yakama Nation's interest in avoiding the taxation of its members was "inextricably intertwined" with the interests of the two other plaintiffs "in avoiding their own taxation." Id. at 816.

The case before us presents an altogether different situation. We cannot fairly describe the injuries claimed by the Plaintiff States as "wholly derivative" of injuries to the taxpayers in those States flowing from the 2017 Act. We have already noted, for example, the absence of taxpayers in this litigation, in contrast

22

to the important role of the manufacturer and the individual tribal member in the proceedings in Yakama Nation to undo the tax that was most directly imposed on them. Moreover, while each Plaintiff State might soften the burden on taxpayers by lowering its own state taxes, doing so would neither restore the lost state tax revenue nor free the States from what they allege is federal oversight over their state fiscal policies.

Because Regan's exception to the AIA applies to the facts of this case, we hold that the AIA does not foreclose our review of the Plaintiff States' claims.

II.

Turning to the merits, the Plaintiff States argue that the SALT deduction is required by the text of Article I, Section 8 and the Sixteenth Amendment of the Constitution. The SALT deduction cap, they say, effectively eliminates a constitutionally mandated deduction for taxpayers. The Plaintiff States also argue that the SALT deduction coerces them to abandon their preferred fiscal policies, in violation of the Tenth Amendment. After "paus[ing] to consider the implications" of the arguments on both sides, as well as the history of the deduction and the precedent that binds us, we conclude that the SALT deduction

23

cap is constitutional.  Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB"), 567 U.S. 519, 550 (2012) (opinion of Roberts, C.J.) (quotation marks omitted).

                                    A.

What really propels the plaintiffs' view that Congress is constitutionally foreclosed from eliminating or curtailing the SALT deduction is their position that, until 2017, Congress had never done so.  We disagree that the Constitution imposes such a constraint on Congress.

To explain why we disagree, we start with the text of the relevant constitutional provisions.  Congress's broad power to tax is limited only by restrictions "expressed in or aris[ing] from the Constitution."  United States v. Bennett, 232 U.S. 299, 306 (1914).  Of course, Article I, Section 8, the Tenth Amendment, and the Sixteenth Amendment do not expressly require the SALT deduction or limit Congress's tax power to do away with it.[4]  But we recognize that "the text of the Constitution provides the beginning rather than the final

---

[4] See U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises . . . but all Duties, Imposts and Excises shall be uniform throughout the United States"); U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); U.S. Const. amend. XVI ("The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.").

answer to every inquiry into questions of federalism." Garcia v. San Antonio Met. Transit Auth., 469 U.S. 528, 547 (1985). "In order to be faithful to the underlying federal premises of the Constitution, courts must look for the postulates which limit and control." Id. (quotation marks omitted).

The Plaintiff States argue that principles of federalism protect each State's "sovereign authority to raise revenue and determine their own fiscal priorities" and bar the federal Government from crowding States "out of traditional revenue sources." Appellants' Br. 31. But they have not demonstrated how the 2017 cap on the deduction unconstitutionally undermines their state sovereign authority over fiscal matters or their ability to raise revenue. The Plaintiff States fail to plausibly allege that their taxpayers' total federal tax burden is now so high that they cannot fund themselves. And while they argue that the SALT deduction lowers "the effective cost of state and local taxes," Appellants' Br. 37–38, they point us to nothing that compels the federal Government to protect taxpayers from the true costs of paying their state and local taxes.

As the Plaintiff States urge and the District Court explored, we may also seek an answer in, among other things, "historical understanding and practice" relating to this issue. Printz v. United States, 521 U.S. 898, 905 (1997). How the

25

SALT deduction has historically been perceived might shed light on the structural limitations on Congress's power "that ultimately arise from the Constitution itself," Mnuchin, 408 F. Supp. 3d at 416 (citing Printz, 521 U.S. at 918, 922). In fact, the history of the deduction helps the Plaintiff States virtually not at all.

It is true that there have long been individual legislators who believed that a SALT deduction (or some variation of it) reflected good tax policy and equitably divided scarce resources between the federal Government and the States. See Cong. Globe, 37th Cong., 2d Sess. 1194 (1862) (reproduced at Joint App'x 195) (Congressman Morrill of Vermont describing the "vital importance to [the States] that the [federal] Government should not absorb all their taxable resources," without referring to the SALT deduction); see also H. Parker Willis, The Tariff of 1913: III, 22 J. Pol. Econ. 218, 227 (1914) (reproduced at Joint App'x 231) (recounting that the legislators who passed the 1913 federal income tax believed "the field ought to be shared with the states" and that "[t]he best way to do this" was through a SALT deduction, but that legislators originally planned to provide the deduction only "in those states that already had" an income tax); H.R. Rep. No. 88-749 at 48 (1963) (reproduced at Joint App'x 233) (explaining that

26

the SALT deduction is "an important means of accommodation where both the State and local governments on one hand and the Federal Government on the other hand tap th[e] same revenue source"). When a 1986 tax bill proposed eliminating the deduction for state and local sales taxes, for example, some members of the Senate launched a full-scale defense of the deduction. 132 Cong. Rec. 13,590 (1986). Senator Durenberger of Minnesota explained that "[s]ince the creation of the Federal income tax" the SALT deduction "has been accepted as a necessary feature of federalism" because "[i]t preserves a portion of the tax base for State and local governments to fund the services which we count on them to provide," 132 Cong. Rec. 13,608. Those words echoed earlier predictions of Senator Moynihan of New York, who warned that eliminating the deduction would "change the constitutional balance in some fundamental way," as "more and more decisions will be made in Washington." Income Tax Deductions of State and Local Governments: Hearing on Tax Reform Proposals Before the S. Comm. on Finance, 99th Cong., at 70 (1985) (reproduced at Joint App'x 252). The Senate then passed a resolution proclaiming that the SALT deduction was "a cornerstone of Federalism" and that eliminating it would "constitute an unjustified Federal intrusion into the fiscal affairs of States" and "prejudice the

27

right of State and local governments to select appropriate revenue measures."

132 Cong. Rec. 16,070.

But the voices of those individual members of Congress have over time been drowned out by the overall statutory history of the deduction, which reflects that Congress was principally concerned with reserving taxable resources for the States by various means. At best, Congress viewed the SALT deduction as only one means to achieve this result. Recall that in the same year that the Senate passed its resolution, Congress proceeded to eliminate the deduction for state and local sales taxes. See Tax Reform Act of 1986, Pub. L. No. 99-514, § 134, 100 Stat. 2085, 2116. The Plaintiff States downplay this legislative development by claiming that sales taxes are not nearly as important as income and property taxes. Their argument is hard to accept. The earlier Senate resolution on which the Plaintiff States rely itself ascribed at least equal importance to each of these sources of state revenue and expressly recognized that sales taxes constituted "the largest source of revenue for all States combined." 132 Cong. Rec. at 16,070. And as we have seen, the Tax Reform Act of 1986 diminished the role of the SALT deduction in the federal tax scheme. See Pub. L. No. 99-514, § 701, 100 Stat. at 2320–45. Congress curtailed the deduction again in 1990 when it introduced

the Pease limitation, which reduced the value, if not the applicability, of the SALT deduction for high-income earners. See Omnibus Budget Reconciliation Act, Pub. L. No. 101-508, § 11,103, 104 Stat. at 1388–406. Prior to 2017, it appears, Congress did not view its authority to limit the SALT deduction as subject to any relevant constitutional constraints. This supports our conclusion that the Constitution itself does not limit Congress's authority to impose a cap.

We cannot help but note that the Plaintiff States' arguments mimic those that the Supreme Court rejected in South Carolina v. Baker, 485 U.S. 505, 515–27 (1988). In Baker, the Court finally addressed the merits of the claims that had been at issue in Regan and held that Congress had the power to tax interest earned on state-issued bonds even though it had not previously done so. If anything, South Carolina's claims in Baker were stronger than those of the Plaintiff States. While Congress has amended the SALT deduction over the years, the tax at issue in Baker—which would have removed the exemption for interest earned on state-issued bonds—really was novel. Congress had not tinkered with the exemption until it imposed the tax. See id. at 523. And in contrast to the SALT deduction, the possibility that Congress might tax state-issued bonds was debated in the runup to ratification of the Sixteenth

29

Amendment. See Hughes Is Against Income Amendment, N.Y. Times, Jan. 6, 1910, at 2. The Supreme Court nonetheless determined that "the owners of state bonds have no constitutional entitlement not to pay taxes on income they earn from state bonds, and States have no constitutional entitlement to issue bonds paying lower interest rates than other issuers." Baker, 485 U.S. at 525.

Consistent with Baker, and for the other reasons set forth above, we reject the Plaintiff States' contention that the Constitution mandates the SALT deduction.

B.

The Plaintiff States alternatively assert that the SALT deduction cap coerces them to abandon their preferred fiscal policies in favor of lower taxes and reduced spending, in violation of the Tenth Amendment. We agree with the District Court that the plaintiffs fail to state a Tenth Amendment claim. We are not persuaded that the cap unconstitutionally infringes on state sovereignty.

Congress may use its taxing and spending authority to "encourage a State to regulate in a particular way," and may "hold out incentives to the States as a method of influencing [their] policy choices." New York v. United States, 505 U.S. 144, 166 (1992). But there are limits. That "pressure" may not amount to

30

"compulsion" because "[t]he Constitution simply does not give Congress the authority to require the States to regulate," directly or indirectly. NFIB, 567 U.S. at 578 (opinion of Roberts, C.J.) (quotation marks omitted). We therefore consider whether the Plaintiff States "ha[ve] a legitimate choice" not to adopt the policy the federal Government seeks to encourage, id., or whether the financial inducement in reality "is a gun to the head," id. at 581.

The Supreme Court has only once deemed a condition unconstitutionally coercive in violation of the Tenth Amendment. In NFIB, Congress "threaten[ed] to withhold all of a State's Medicaid grants, unless the State accept[ed] . . . new[,] expanded funding and complie[d] with the conditions that come with it." Id. at 575. Two factors especially drove the result in NFIB. First, Congress had required that the States comply with the conditions to receive not only new Medicaid funding but also Medicaid funding (upon which the States had come to rely) that would have been available even under the preexisting regulatory scheme. See id. at 580 ("When, for example, such conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes."); id. at 582–84. Second, Congress had threatened to withhold funds constituting

31

over ten percent of state budgets.  Id. at 581–82.  NFIB was thus unlike South Dakota v. Dole, 483 U.S. 203 (1987), in which the Supreme Court rejected a challenge to the constitutionality of a spending condition that threatened to withhold funding worth "less than half of one percent" of the state's budget.  NFIB, 567 U.S. at 581.

The Plaintiff States claim that their citizens face a comparably substantial harm: their federal tax burdens will rise, the value of their homes will fall, and their jobs will disappear.  Specifically, the Plaintiff States allege that their taxpayers "will pay hundreds of millions of dollars in additional federal taxes, relative to what they would have paid had Congress enacted the 2017 Tax Act without the cap."  Appellants' Br. 23.  We accept these allegations as true, and we assume without deciding that a claim of coercion under the Tenth Amendment can arise from injuries to a State's citizens rather than to the State itself.  Yet even then, we conclude that the Plaintiff States have failed to plausibly allege that their injuries are significant enough to be coercive.  As the district court correctly noted, the Plaintiff States relied on an improper comparison between their taxpayers' federal tax burden under the 2017 Tax Act as enacted, and their taxpayers' federal tax burden under a hypothetical version of the 2017 Tax Act

32

without the SALT deduction cap.  Such a hypothetical tells us nothing about the actual financial effects of the SALT deduction cap on the Plaintiff States' taxpayers.  And even if such a comparison were instructive, the cost to individual taxpayers pales in comparison to the threatened deprivation of 10 percent of the States' budgets at issue in NFIB.

To further explain the threat of harm, the Plaintiff States add that the SALT deduction cap could cause home equity values in New York State alone to plummet by over $60 billion, in-state spending to decrease by $1.26 to $3.15 billion, and the economy to lose between 12,500 and 31,300 jobs.  Without baseline figures to put these numbers in context, however, we are not convinced by the argument.  We do not mean to minimize the Plaintiff States' losses or the impact of the cap on their respective economies.  But we find it implausible that the amounts in question give rise to a constitutional violation.

Similar problems plague the Plaintiff States' suggestion that their reduced tax revenues coerce them to change their fiscal policies and approaches.  They argue that New Jersey, for example, is likely to lose over $100 million in property and real estate transfer taxes in 2019 and 2020.  See Appellants' Br. 45.  But New Jersey's budget in 2019 alone was $37.3 billion.  See New Jersey Office of

33

Management & Budget, Citizen's Guide to the Budget: Fiscal Year 2019 at 3 (Dec. 2018), available at https://bit.ly/2OABSac. Without more, quantitative losses constituting such a small portion of a State's budget will not exert such undue pressure as to raise a genuine constitutional concern. See NFIB, 567 U.S. at 581 (explaining that it was "easy to see how the Dole Court concluded that the threatened loss of less than half of one percent of South Dakota's budget" passed constitutional muster).

The Plaintiff States try again to improve their claims by asserting that the SALT deduction cap violates the independent constitutional principle of equal sovereignty among the States. Congress knew, they say, that the cap's injuries would be unevenly distributed. In pursuing this tack, the Plaintiff States rely on Shelby County v. Holder, 570 U.S. 529 (2013), to claim that facially neutral laws like the SALT deduction cap can violate the principle of equal state sovereignty if they affect States differently. In Shelby County, the Supreme Court reviewed the Voting Rights Act's coverage formula, which determined which States are required to obtain the federal Government's approval before changing their voting procedures. See id. at 537–40. The formula was held unconstitutional not because it yielded results that differed across States, but because it did so based

on facts that, in the majority's view, were outdated and no longer true.  See id. at 550–51; compare South Carolina v. Katzenbach, 383 U.S. 301 (1966).  Here, as explained, the SALT deduction cap has no effect on state sovereignty.  The outsized effect of the SALT deduction cap on the Plaintiff States arises only because the Plaintiff States previously benefitted most from the SALT deduction, not because the cap applies to some States but not others.  We agree with the District Court that "the bare fact that an otherwise valid federal law necessarily affects the decisional landscape within which states must choose how to exercise their own sovereign authority hardly renders the law an unconstitutional infringement of state power."  Mnuchin, 408 F. Supp. 3d at 416–17.

Finally, the Plaintiff States complain that Congress unfairly targeted them.  Given our discussion of the statutory history, it is obviously true that members of Congress were aware that the SALT deduction cap would adversely affect some States more than others.  But the SALT deduction cap is not unlike the countless federal laws whose benefits and burdens are unevenly distributed across the country and among the several States.  As noted above, "Congress may use its spending power to create incentives for States to act in accordance with federal policies," as long as "pressure [does not] turn[] into compulsion."  NFIB, 567 U.S.

at 577–78 (quotation marks omitted).  At most, Plaintiff States' allegations reflect that lawmakers were focused on the permissible legislative purpose of influencing tax policy.  Nothing in Shelby County suggests that the equal sovereignty principle bars such a purpose.

In summary, we agree with the District Court that the SALT deduction cap is not coercive in violation of the Tenth Amendment or the principle of equal sovereignty.

CONCLUSION

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.